Michael, Appellant, *v.* Hahnemann Medical College and Hospital of Philadelphia.

Ellsworth, Appellant, *v.* St. Agnes Hospital.

Argued November 12, 1959; reargued May 4, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

re-argument refused July 31, 1961.

*Harry Lore,* with him *Dorfman, Pechner, Sacks & Dorfman,* for appellant.

*James E. Beasley,* with him *Jerome E. Ornsteen* and *Cohen, Ornsteen and Beasley,* for appellant.

*John J. Tinaglia,* with him *Michael A. Foley,* for appellee.

*Morris Duane,* with him *John B. Martin,* and *Duane, Morris & Hecksher,* and *Cornelius C. O'Brien, Jr.,* for appellee.

*Stephen B. Narin, Marvin Garfinkel,* and *Narin and Garfinkel,* and *Quinlan, Ozorowski & Brandschain,* filed a brief as amicus curiae under Rule 46.

OPINION BY MR. CHIEF JUSTICE JONES, June 27, 1961:

The appeals in these two cases will be disposed of in this one opinion since the contentions of the appellants in both cases are the same. Simply stated, the question posed is whether the rule of law that an eleemosynary institution is not liable for the torts of its agents and employees shall now be abrogated by this court's decision.

In the case in which St. Agnes Hospital is the defendant, the plaintiff administratrix sued to recover damages for allegedly negligent medical and surgical care and service given her decedent, while in the hospital, by two doctors in their capacity as alleged agents of the hospital. In the other case, the plaintiff sued the Hahnemann Medical College and Hospital of Philadelphia, Inc., jointly with two doctors, for serious and permanent injury allegedly suffered by the plaintiff as the result of negligence and carelessness in the performance of an operation on the plaintiff by one of the doctors, while under the control and supervision of the other, who was a staff physician and surgeon of the hospital. In each case, the hospital answered claiming charitable immunity and, on motions on the pleadings, a judgment in favor of each hospital was entered. The present appeals are from those judgments.

The rule of charitable immunity has long since been in force in Pennsylvania, see *Fire Insurance Patrol v. Boyd,* 120 Pa. 624, 15 Atl. 553 (1888). If the doctrine of charitable immunity is, as the appellants contend, no longer suited to the times and should be dispensed with, the proper way to accomplish that end is prospectively by legislation and not retroactively by judicial ukase. Under our democratic form of government, it is the legislature that can competently declare and promulgate public policy and not the courts. It is to be hoped, therefore, that, with this current decision,

the appellants' contention will assume a state of quiescence so far as further insistent court action is concerned. Perhaps that is too much to hope for. It is just three years since the identical contention was urged upon us and rejected in *Knecht v. St. Mary's Hospital*, 392 Pa. 75, 140 A. 2d 30.

What we said in this connection in the *Knecht* case (p. 78) bears repetition here. "A rule of non-liability, even though judge-made, that has become as firmly fixed in the law of this State as has the charitable immunity from tort liability, should not be abrogated otherwise than by a statute made to operate prospectively. If the rule were to be abandoned by court decision, it would lay open to liability all charities for their torts of the past that were not barred by the statute of limitations at the time of the rendition of the rescinding decision. The injustice of such an imposition of liability upon charities that theretofore had a right to rely on the rule of immunity is readily apparent. Whereas, if and when the rule is abrogated prospectively, which the legislature could provide, all charities then made subject to tort liability for the future could protect themselves by appropriate insurance. Moreover, whether, in this day of traffic hazards from automobile vehicles of charities as well as of all others, the rule as to charitable immunity should be rescinded poses a question of public policy which falls peculiarly within the competence of the legislature."

What Chief Justice BLACK said for this court in *McDowell v. Oyer*, 21 Pa. 417, 423 (1853), concerning stare decisis, is presently most apposite, viz., "It is sometimes said that this adherence to precedent is slavish; that it fetters the mind of the judge, and compels him to decide without reference to principle. But let it be remembered that *stare decisis* is itself a principle of great magnitude and importance. It is absolutely necessary to the formation and permanence of

any system of jurisprudence. Without it we may fairly be said to have no law; for law is a fixed and established *rule,* not depending in the slightest degree on the caprice of those who may happen to administer it. . . . It is this law which we are bound to execute, and not any 'higher law,' manufactured for each special occasion out of our own private feelings and opinions. If it be wrong, the government has a department whose duty it is to amend it, and the responsibility is not in any wise thrown upon the judiciary."

The rule of charitable immunity in this State has been long established and oft applied. Such being the case, the imposition of liability upon charities for the negligence of their agents or employees is properly a matter for the competence of the legislature.

Judgment affirmed in appeal No. 211.

Judgment affirmed in appeal No. 275.

Mr. Justice EAGEN dissents.

---

CONCURRING OPINION BY MR. JUSTICE BELL:

All the members of this Court and all the parties agree that beginning with *Fire Insurance Patrol v. Boyd,* 120 Pa. 624, 15 A. 553 (*1888*), and continuing through *Knecht v. St. Mary's Hospital,* 392 Pa. 75, 140 A. 2d 30 (*1958*), this Court has granted immunity to charities and other eleemosynary institutions from liability for the torts of their agents, servants, workmen and employees. Today, fortunately for hospitals and all charitable institutions in Pennsylvania which do so much good, this Court has reaffirmed those decisions and that doctrine.

I join in the Opinion of the Court. However, the dissenting Opinions advocate policies which would so upset the law of Pennsylvania and would bring so much harm to hospitals and other charitable institutions, and the claimants advocate specious principles which are so inimical to and violative of well settled

principles of law that I feel compelled to write this concurring Opinion* to promptly answer and refute them.**

1. The minority opinions would overrule without any legal justification decisions of this Court covering a period of over 70 years, and would not only disregard, but would effectually obliterate the last vestiges of the wise, salutary and time-tested principle of Stare Decisis.

2. The minority substitute their social-political philosophy for the law which has been enunciated and reiterated by the Supreme Court of Pennsylvania for 73 years; and, equally important, the social policy they would have this Court adopt flies in the teeth of *the intent* of the Legislature of Pennsylvania which has refused, in nearly every session for over 70 years, to enact legislation to repeal or modify the doctrine of charitable immunity.

3. Even if we assume that the rule of charitable immunity was Judge-made,*** the unsuccessful at-

---

* Compare *U. S. v. Mersky*, 361 U. S. 431, 441, where Mr. Justice BRENNAN, concurring said: "I join the opinion of the Court. . . . Except that arguments are made here in dissent which would unsettle what has been settled by our precedents and reintroduce archaisms into federal criminal procedure, I would have refrained from expressing my views."

** If these arguments are not answered specifically and forthwith, they will likely be argued soon again in this Court or in the halls of the Legislature.

*** The rule of charitable immunity is usually referred to as Judge-made in spite of the fact that the Legislature of Pennsylvania by Act of January 28, 1777,**** adopted as the law of Pennsylvania the common law of England, with certain exceptions not now pertinent. In 1777 the rule of charitable immunity was clearly part of the common law of England. As early as 1811 this Court in *Clayton v. Clayton*, 3 Binney 476, after quoting the Act of January 28, 1777, supra, said (pages 490-491) : "The rule relied on by the

---

**** 1 Sm. L. 429, §2, 46.PS §152.

tempts to have it legislatively abolished or changed over a period of 70 years have made it the *legislatively approved* public policy of Pennsylvania. Under such circumstances, if a change should be made in this long and firmly embedded Public Policy of the Commonwealth, as the minority desire, it should be and can be abolished only by the Legislature. Nevertheless, the minority would have the Courts flout the policy, and inexcusably and unnecessarily usurp the functions and powers of the Legislature* when those powers are under the Constitution of Pennsylvania (and of the United States) vested solely in the Legislature (and in Congress). Article II, §1 provides that "The legislative power of this Commonwealth shall be vested in a General Assembly . . ."; and Article III, §1 provides "No law shall be passed except by bill. . . ."

The Constitution of the United States,** and similarly the Constitution of Pennsylvania, created and or-

---

plaintiff is frequently asserted, in the English books, which are evidence of the common law. . . . I cannot see on what grounds the judiciary would be authorized to change the strong uniform current of decision, unless by the aid of the legislative branch."

* The dangers inherent in such a usurpation ought to be apparent. It would undoubtedly stimulate retaliatory measures which will embitter both the Courts and the Legislature (or the Executive, as the case may sometimes be). In the history of our Country, one branch of Government has from time to time sought to encroach upon another branch, sometimes intentionally, more often unwittingly. These attempts, whether temporarily successful, or unsuccessful, have stirred wide bitterness, cleavage and strife which were not extirpated for many, many years. A recent outstanding example was the open attempt of a President to pack the Supreme Court of the United States and make the Court a puppet of the Executive, in order to "constitutionalize" some of his unconstitutional plans for worthy objectives.

** The Constitution of the United States was described by the illustrious English Statesman William Pitt: "It will be the wonder and admiration of all future generations." It enabled the American people in the short space of 150 years to become the happiest, the

dained a Government composed of three great, separate and independent, yet co-ordinate Branches—the Executive, the Legislative and the Judicial. On this framework of Constitutional Government there was wisely and solidly built liberty and equal justice for all.

As this Court has aptly said: "Nothing is clearer in the constitution than the separation of the legislative and judicial branches of our state government. Neither possesses the powers of the other, and any power inherent in the one cannot be exercised by the other." *Hoopes v. Bradshaw,* 231 Pa. 485, 487, 80 A. 1098. " 'The whole judicial power of the Commonwealth is vested in the courts. Not a fragment of it belongs to the legislature.' " *Commonwealth v. Scoleri,* 399 Pa. 110, 134, 160 A. 2d 215. "Conversely, courts may not encroach upon the powers of the legislature." *Leahey v. Farrell,* 362 Pa. 52, 56, 66 A. 2d 577.

It is well for Courts to resist temptation and constantly recall the sage advice of Mr. Justice FRANKFURTER who said in *Green v. United States,* 356 U. S. 165, 193: "The admonition of Mr. Justice BRANDEIS that we are not a third [or super] branch of the Legislature should never be disregarded."

There are several very important reasons why this principle or doctrine of charitable immunity should not be changed by this Court. Public charities are not like private individuals or corporations for profit, they are and *in Pennsylvania* always have been and should continue to be favorites* of the law: *Voegtly Estate,*

---

most prosperous, and the greatest nation in the world. This was accomplished by the *arduous* labor, the *sacrifices,* the thrift, the inventive genius, and the initiative, *untrammeled by government,* of free men and women steeped deep in the love of God.

* Charities are so favored in Pennsylvania that they, their income, their real property, and gifts inter vivos and testamentary which are made to them are exempt from all taxes including inheritance taxes.

396 Pa. 90, 151 A. 2d 593. See also: *Girard Will Case*, 386 Pa. 548, 127 A. 2d 287, and numerous authorities cited therein. The reasons are obvious.

## The Long and Well Settled Law

In *Bond v. Pittsburgh*, 368 Pa. 404, 84 A. 2d 328, the Court, speaking through Mr. Justice (later Chief Justice) HORACE STERN, aptly said (pages 407, 408, 409) : "Notwithstanding the violent criticisms that have been directed by academic legal writers against the doctrine of the immunity of charitable organizations from tort liability, and notwithstanding also the fact that there is considerable conflict in the judicial decisions on the subject among the several States, our own Commonwealth has, from the earliest times, stood firm in its adherence to the principle of immunity. For confirmation of that assertion it is only necessary to refer to such cases as Fire Insurance Patrol v. Boyd, 120 Pa. 624, 15 A. 553; Gable v. Sisters of St. Francis, 227 Pa. 254, 75 A. 1087; Siidekum, Administrator, v. Animal Rescue League of Pittsburgh, 353 Pa. 408, 45 A. 2d 59; Betts v. Young Men's Christian Association of Erie, 83 Pa. Superior Ct. 545; Paterlini v. Memorial Hospital Ass'n. of Monongahela City, 247 Fed. 639 (3 C.C.). In the Gable case, supra, it was said (p. 258, A. p. 1088), 'It is a doctrine too well established to be shaken, and as unequivocally declared in our own state as in any other, that a public charity cannot be made liable for the tort of its servants.' Surely a doctrine so deeply embedded in the structure of our common law should not lightly be overturned in violation of the rule of stare decisis. Principles of the common law are not established or developed arbitrarily; they congeal during the course of the years from the fluidity of recurrent judicial decisions which presumably reflect the sentiments and social values of the commu-

nity. Measured by that standard there is no class of institutions more favored and encouraged by our people as a whole than those devoted to religious or charitable causes. Public-minded benefactors are not likely to have their generous impulses encouraged if advised that some janitor, watchman or other employe of a charitable organization who carelessly fails to note the displacement of a brick or stone in a pavement may thereby bring about the loss of all the property and funds which the donors had sought to devote to the common good. If and when there is to be any change in the doctrine of the immunity of charitable institutions from tort liability, it ought to be effected, not by the courts, but *by the legislature, which is, of course, the ultimate tribunal to determine public policy.** Incidentally, it will be remembered that this is not the only class of cases in which the victim of an accident may not recover damages from other than the individual who actually committed the tort; for instance, no such recovery is permitted where the accident results from the negligence of the agent or servant of a municipality while engaged in the performance of a governmental function.

". . . What is the real basis upon which the immunity principle rests? It is, as expressed in Fire Insurance Patrol v. Boyd, supra (p. 647, A. p. 557) that *the funds specially contributed for a public charitable purpose should not be misapplied to objects not contemplated by the donors,* for a public charity is but a trustee and is bound to apply its funds in furtherance of the charity and not otherwise. It was also stated in Gable v. Sisters of St. Francis, supra, (p. 258, A. p. 1088) that the doctrine rests fundamentally on the fact that liability, if allowed, would lead inevitably to

---

* Italics throughout, ours.

a diversion of the trust funds from the purposes of the trust."

In *Knecht v. St. Mary's Hospital,* 392 Pa. 75 (1958), supra, Mr. Chief Justice JONES (speaking for the Court) reiterated and reaffirmed the charitable immunity principle and said (pages 76, 78):

"The immunity of an eleemosynary institution from tort liability has long been the established rule in Pennsylvania: [citing cases].

. . .

"A rule of non-liability, even though judge-made, that has become as firmly fixed in the law of this State as has the charitable immunity from tort liability, should not be abrogated otherwise than by a statute made to operate prospectively. . . . whether, in this day of traffic hazards from automotive vehicles of charities as well as of all others, the rule as to charitable immunity should be rescinded *poses a question of public policy which falls peculiarly within the competence of the legislature."*

### Public Policy

In almost every session of the Legislature since the charitable immunity doctrine or principle was *expressly* recognized and established by this Court, attempts have been made to have it abolished or modified by the Legislature. These *unsuccessful* attempts which continued for nearly three-quarters of a century demonstrate that the Legislature believed for 70 odd years that the charitable immunity principle is *sound and wise and in accordance with the State's public policy* toward charitable institutions. It is therefore fair to say that not only in theory and presumptively but far more important *in actuality,* charitable immunity has become the established public policy of Pennsylvania. We note that once again, viz., in 1959-1960, the Legis-

lature appointed a committee to study this problem in all its phases in order to determine whether it is wise to continue or modify or abolish charitable immunity. It is obvious that any change in the State's public policy towards charities should be left to the Legislature, first because the Constitution commits this power to the Legislature, and secondly because the Legislature and it alone will have at its finger tips *all* of the pertinent data pro and con on this subject—including the financial effect on the hospitals and their charitable contributors, which repeal or modification of the principle would cause.

The minority's statement that charitable institutions in Pennsylvania have been sufficiently alerted to protect themselves by insurance because of the successful attacks on charitable immunity *in our bordering states*—in view of the decisions of the Supreme Court of Pennsylvania which clearly and unquestionably established charitable immunity from torts and iterated and reiterated it over and over again from 1888 to 1958—is not only an obvious non sequitur but is clearly without any merit. Furthermore, in *Knecht v. St. Mary's Hospital,* supra, this Court once again reiterated that any change in the charitable immunity policy would have to come from the Legislature, thereby lulling charitable institutions into believing that it would be unnecessary to obtain insurance until such time as the Legislature had acted.

### Reason and Necessity

The prior decisions of this Court are supported by the Legislature and by Public Policy, by reason and by necessity. It is an indisputable fact that notwithstanding the enormous amounts hospitals charge patients, nearly all private (general) hospitals operate in the red. Private hospitals cannot exist as such without (1)

the benevolence of charitable benefactors and (2) State and/or City aid. Hospitals * in metropolitan Philadelphia and in many other parts of the State, are desperate for money—even with State grants and several hundred thousands of dollars received annually from endowments and gifts of charitably disposed persons and from fund drives, these hospitals are not able to cover their operating costs and expenses, necessary depreciation, and interest and amortization of their fixed obligations. It has long been recognized and it is an indisputable fact that the money given to hospitals creates *a Trust for Humanity*. Hospitals, in their care and relief of the sick, the needy, the poor, and the suffering, are the greatest of all charities. Who will want to continue to give to hospitals when they learn that enormous sums of money (huge and at times fantastic verdicts of $50,000 to $300,000 in a single case are not uncommon) will be diverted from the use and benefit of the hospital and the ill and suffering patients, and will instead be used to pay many persons for real or imaginary or faked ills and their attorneys who will likely receive a contingent fee of 33% to 50%? Isn't it obvious that charitable contributions will dry up, and isn't it likely that we will force private hospitals into becoming State or Government owned and operated institutions and hasten socialized medicine? Isn't it clear as crystal that the *Public Welfare* in this class of case is of far greater importance than a private individual's injury?

Two reasons are given by the minority to support their view, each of which is inadequate. (1) Hospitals can obtain at great additional (but unknown) expense, insurance to protect themselves—this is nothing new.

---

* With the exception of Catholic hospitals whose expenses are much less because of the charitable work performed (without charge) by nuns.

(2) Many of our sister States have modified or abolished the rule or doctrine of charitable immunity. Unless there are other persuasive reasons, this latter, like the former, furnishes no adequate reason why we should follow their example. The views and decisions of Courts of our sister States are always entitled to careful consideration and respect, but we have always reserved the right—which they in turn exercise—to make our own decisions in accordance with what we believe the law of Pennsylvania is or, in the light of our statutes or our pertinent prior decisions, or our public policy (if applicable), or reason and logic, should be.

## Stare Decisis

To abrogate the long and well settled principle of charitable immunity and overrule a myriad decisions of this Court from 1888 to 1958, would, together with other decisions handed down by the present Court in the last few years, finally and effectually obliterate the principle of Stare Decisis which is part of the law of Pennsylvania (*Borsch Estate,* 362 Pa. 581, 589, 67 A. 2d 119).

In a Constitutional Republican form of Government such as ours, which is based upon law and order, *Certainty and Stability are essential.* Unless the Courts establish and maintain certainty and stability in the law, businessmen cannot safely and wisely make contracts with their employees or with each other; the meaning of wills, bonds, contracts, deeds and leases will fluctuate and change with each change in the personnel of a Court; property interests will be jeopardized and frequently lost or changed; Government cannot adequately protect law-abiding persons or communities against criminals; private citizens will not know their rights and obligations; and public officials will not know from week to week or month to month the powers

and limitations of Government. This has been recognized for centuries by English-speaking peoples. Lord Coke, Chief Justice of England, thus wisely expressed (circa 1600) these truths: "The knowne certaintie of the law is the safetie of all." This has been a beacon light for Anglo-American Courts, for text authorities, and for law-abiding Americans ever since the foundation of our Country. In the realm of the law it is usually expressed in the principle known as Stare Decisis. Stare Decisis is one of the bed-rocks upon which the House of Law has been erected and maintained.

In *Brown v. Allen,* 344 U. S. 443 (1953), Mr. Justice JACKSON (in a concurring opinion on the abuse of the writ of habeas corpus) aptly and pertinently said (page 535) : "Rightly or wrongly, the belief is widely held by the practicing profession that this Court no longer respects impersonal rules of law but is guided in these matters by personal impressions which from time to time may be shared by a majority of Justices. Whatever has been intended, this Court also has generated an impression in much of the judiciary that *regard for precedents and authorities is obsolete, that words no longer mean what they have always meant to the profession,* that *the law knows no fixed principles."*

Mr. Justice FRANKFURTER, in his concurring opinion in *Green v. United States,* 356 U. S. 165, 192 (1958) said: "To be sure, it is never too late for this Court to correct *a misconception in an occasional decision, even on a rare occasion* to change a rule of law that may have long persisted but also have long been questioned and *only fluctuatingly applied.** To say that every-

---

* It is obvious, if we are to progress, that there always will be exceptions to every general rule or principle, and that neither the law nor the principal of stare decisis can or should be as immutable as the laws of the Medes and the Persians. Nevertheless, it is obvious, at least to me, that the principle of stare decisis should not be ignored or extirpated, actually or effectually, because of changes

body on the Court has been wrong for 150 years and that that which has been deemed part of the bone and sinew of the law should now be extirpated is quite another thing. . . . *The admonition of Mr. Justice* BRANDEIS *that we are not a third branch of the Legislature should never be disregarded."*

Mr. Justice DOUGLAS, who is generally regarded as the leading opponent of Stare Decisis, in an article written for the Columbia Law Review of June 1949,

in the personnel of a Court. Mr. Justice FRANKFURTER has stated the two exceptions which to him seem justifiable. I agree with him, and while I would express the same thoughts a little differently, I would go further. I would hold that the principle of Stare Decisis should always be applied, *irrespective of the changing personnel of this (or any Supreme) Court*, except in the two situations set forth by Justice FRANKFURTER and in the following situations: (1) Where the Supreme Court of Pennsylvania is convinced that prior decisions of the Court are irreconcilable, or (2) the application of a rule or principle has *undoubtedly* created great confusion;** or (3) in those rare cases where the Supreme Court of Pennsylvania is *convinced* that the reason for the law *undoubtedly* no longer exists, and modern circumstances and Justice combine to require or justify a change, and no one's present personal rights or vested property interests will be injured by the change. Change of circumstances or modern circumstances does not mean, nor has it ever heretofore been considered as the equivalent of "change of personnel in the Court," or the substitution of the social or political philosophy of a Judge for the language of the Constitution or of a written instrument, or well settled principles of law.

** See early and modern parol evidence rule: *Gianni v. Russell*, 281 Pa. 320, 126 A. 791; *Phillips Gas & Oil Co. v. Kline*, 368 Pa. 516, 84 A. 2d 301; *Grubb v. Rockey*, 366 Pa. 592, 79 A. 2d 255; *Walker v. Saricks*, 360 Pa. 594, 63 A. 2d 9; *Bardwell v. Willis Co.*, 375 Pa. 503, 100 A. 2d 102. See also: *Cunningham Estate*, 395 Pa. 1, 15 et seq., 149 A. 2d 72, in re the Pennsylvania Rule of Apportionment; cf. also: *Northwestern States Portland Cement Company v. Minnesota*, and *Williams v. Stockham Valves & Fittings, Inc.*, 358 U. S. 450, in re State taxation of interstate commerce.

Vol. 49, p. 735, said: "Uniformity and continuity in law are necessary to many activities. If they are not present, the integrity of contracts, wills, conveyances and securities is impaired. *And there will be no equal justice under law if a negligence rule is applied in the morning but not in the afternoon.* Stare decisis provides some moorings so that men may trade and arrange their affairs with confidence. Stare decisis serves to take the capricious elements out of law and to give stability to a society. It is a strong tie which the future has to the past."

Mr. Justice OWEN J. ROBERTS, Pennsylvania's most illustrious member of the Supreme Court of the United States, in a dissenting opinion in *Smith v. Allwright,* 321 U. S. 649, 669, thus aptly and strikingly expressed his views concerning the erosion or abolition of the principle of stare decisis: "The reason for my concern is that the instant decision, overruling that announced about nine years ago, tends to bring adjudications of this tribunal into the same class as a *restricted railroad ticket, good for this day and train only.* I have no assurance, in view of current decisions, that the opinion announced today may not shortly be repudiated and overruled by justices who deem they have new light on the subject."

Mr. Justice EAGEN well expressed the same concern for Stare Decisis in the recent case of *Commonwealth v. Woodhouse,* 401 Pa. 242, 253, 164 A. 2d 98 (1960); ". . . Unquestionably, in a republican form of government as we are privileged to enjoy, order, certainty and stability in the law are essential for the safety and protection of all. Stare Decisis should not be trifled with. *If the law knows no fixed principles, chaos and confusion will certainly follow.* . . . If some principle is based upon an erroneous premise long since dissipated by accurate, dependable knowledge, no one may

justifiably or reasonably argue that the law should not be brought up with the times. If it is clear that the reason for a law no longer exists and modern circumstances and justice require a change, and no vested rights will be violated, a change should be made."

The reason I am so deeply disturbed by the minority opinions will be apparent to anyone who examines the recent record of this Court and the frequency with which the Court has expressly or impliedly * overruled or nullified so many prior decisions and so much well settled law. In the words of Mr. Justice JACKSON: *"this Court has generated an impression* in much of the judiciary [and of the Bar] *that regard for precedents and authorities is obsolete,* that words no longer mean what they have always meant to the profession, that *that law knows no fixed principles."* For over a century the Supreme Court of Pennsylvania has been regarded as one of the two or three outstanding Courts in our Country. Surely the Justices who endowed our Court with such high esteem and prestige cannot, as Justice FRANKFURTER aptly expressed it, have been so often wrong for 75 years as the decisions of the present Court in the last three years indicate.

## Constitutionality of Prior Decisions

A new and novel proposition has been advanced by one of the present appellants,** namely, that *all* of the many decisions of this Court, which for over 70 years have granted to charities immunity from tort liability,

---

* Cases can be and have been changed or nullified in several ways: (a) by expressly overruling them or by stating that they will no longer be followed; or (b) by implication without mentioning them; or (c) by giving them or the language used therein a meaning different from what they have always meant to the profession.

** And at least impliedly, by one of the dissenting opinions.

are and always have been null and void because they *all violated the Constitution.* This proposition and conclusion is derived from the following general language in Article I, Section 11 of the Constitution of 1874: "All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law. . . ."

If the proposition had any merit, it is more than strange that not one of the many great Constitutional lawyer-Judges who were members of our Court ever discovered this unconstitutionality in a period of over 70 years. It is not difficult to see the reason. The Constitution does not mention, let alone grant, a remedy against persons *who do not* commit an injury, but are liable, if at all, under the judicially created doctrine of respondeat superior. The doctrine of respondeat superior is not covered, included or even mentioned in this or in any other section of the Constitution. Every man who is injured *actually has* a remedy against the person who inflicts the injury. This is admitted, but appellant avers "unconstitutionality" because in some cases where large verdicts are obtained, the person who inflicted the injury will not be *financially* able to pay the verdict and hence the Constitution should be *extended* and stretched to include some person or corporation which will likely be able to pay. This may or may not be a proper subject for Constitutional change —obviously it furnishes no basis for a stretch of the Constitution which would out-Procrustes Procrustes.

───────

CONCURRING OPINION BY MR. JUSTICE BOK:

I favor abolishing the immunity of hospitals for their torts but by the prospective method adopted by the late Mr. Justice CARDOZO and approved by the Supreme Court of the United States in *Great Northern Railway v. Sunburst Oil & Refining Co.,* 287 U. S. 358

(1932) : see also the lead article in the University of Pennsylvania Law Review, Vol. 109, No. 1, issue of November, 1960.

Until a majority of this court agrees with me, I prefer to see the immunity continue. Hence my position as a member of the present majority.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion is brief, didactic, and summary. Aside from the fact that it makes clear that it is dealing with the subject of tort immunity as it applies to so-called charitable institutions, it conveys no picture to the reader as to the manner in which the cases, upon which the decision is based, came into being.

Since the purpose of a judicial opinion is to satisfy the reader that the decision which it expounds is a just one, I believe that some facts should be announced, a few circumstances should be described, and a brief narration should appear as to how and why the complaining litigant came into court seeking redress for asserted grievances.

Since the Majority Opinion supplies none of that sine qua non, I deem it my obligation as a member of this Court to advert to the situations which brought about the two lawsuits which are here today adjudicated.

On February 18, 1959, William Juliano, 28 years of age, while engaged in a construction job, sustained a laceration to one of his fingers when it brushed against a piece of rusty metal. He was treated at the St. Agnes Hospital in Philadelphia where Dr. Joseph Reno sutured the wound. During the succeeding five days Juliano returned to the hospital on three separate occasions for treatment. At no time was an examination made to determine the possibility of circulatory infection, nor was anti-tetanus treatment administered. On

February 24 gangrene set in and Juliano was now held at the hospital. His condition rapidly worsened, a tetanus (lockjaw) developed and on February 28th he died, after suffering the horrible pain which accompanies that dire and dread malady. He left a wife and two children.

Death and survival actions were filed against the St. Agnes Hospital by the administrator of his estate, the complaint alleging that the death of Juliano resulted from the negligence, recklessness and carelessness of the hospital's officers, staff physicians and employees. The defendant hospital denied liability on the basis that it was an "eleemosynary or charitable institution," and moved for judgment on the pleadings. The Court of Common Pleas No. 4 of Philadelphia County granted the motion upon authority of *Knecht v. St. Mary's Hospital,* 392 Pa. 75. The plaintiff appealed.

The second lawsuit involves a complaint filed by Kenneth Michael against the Hahnemann Medical College Hospital and William Ellis and Nicholas T. Viek, doctors in that hospital, alleging that on February 23, 1955, Dr. Ellis, staff physician and surgeon, recommended for the plaintiff-patient a cystocopy operation. On February 28, 1955, Dr. Nicholas T. Viek, while under the supervision of Dr. Ellis, performed an operation entirely different from the one prescribed by Dr. Ellis and as a result the plaintiff suffered a permanent disablement.

In its answer to the complaint, the Hahnemann Hospital averred that it was an eleemosynary corporation and, therefore, not subject to tort action. It moved for judgment on the pleadings, which motion was granted by the Court of Common Pleas No. 5 of Philadelphia County, also on the authority of the *Knecht* case. The plaintiff appealed.

Since the same question was involved in both appeals they were consolidated for consideration and decision.

It cannot be seriously disputed that the acts of negligence averred by the plaintiffs in both lawsuits would, if charged against a non-eleemosynary institution, entitle the plaintiffs to proceed to trial on the merits of their respective allegations. For any medical establishment to have in its employ an employee or agent who neglects to detect the symptoms of so deadly and torturing a disease as tetanus and, because of that neglect, to cause the death of the patient is something for which the establishment should be required to answer. Nor would the courts consider inconsequential a charge against a private organization which maintained on its staff two doctors one of whom diagnoses a particular ailment and the other doctor operates for an entirely different non-existent ailment, with serious consequences to the patient.

If faults of this character are cognizable when levelled against a non-public corporation or firm, why are they not recognized when charged against the hospitals involved in these two lawsuits?

In affirming the nonsuits entered in the court below, the Majority says that "The rule of charitable immunity has long since been in force in Pennsylvania," and, therefore, should not be changed by the courts. It specifically declares that: "If the doctrine of charitable immunity is, as the appellants contend, no longer suited to the times and should be dispensed with, the proper way to accomplish that end is prospectively by legislation and not retroactively by judicial ukase."

The use of the word "ukase" suggests something arbitrary, czaristic, and tyrannical. The Majority thereby implies that if we were to remove the tort immunity which hospitals now enjoy, we would be trampling upon rights which are established and sacrosanct. But it was

precisely by the action of the courts that the immunity doctrine came into being in Pennsylvania. If the word "ukase" is to be employed at all in a discussion of the question before us, it should be used to describe the arbitrary action taken, in the first place, by this Court, to exempt hospitals from their just legal obligations. To remove that immunity would not be an "ukase", but a liberation of the people from the ukase this Court laid down in 1888.

The Majority Opinion says further: "Under our democratic form of government, it is the legislature that can competently declare and promulgate public policy and not the courts."

But it was the courts, and specifically this Court, which promulgated the "public policy" of hospital immunity, and if this Court had the authority in 1888 to proclaim that policy, it certainly has the authority to change it today, especially when modern conditions require, and justice demands, its removal.

The Majority not only rivets upon the people of Pennsylvania its ukase of 1888, but suggests that the subject should "assume a state of quiescence so far as further insistent court action is concerned." It adds, somewhat plaintively that, "perhaps that is too much to hope for." In agreement with the Majority to that extent, that it is "too much to hope for," I would like to explain why, as I view the legal landscape in Pennsylvania, it is inevitable that the doctrine of charitable immunity, like old crumbling covered bridges, will in the not too distant future, disappear.

I must assert at the outset that although the institutions here involved are known as charitable hospitals, they are not charitable in the true sense of the word because charity denotes the giving of something—money, articles, or services—without remuneration of any kind. The Hahnemann and St. Agnes hospitals charge for their services, the patients pay for what they

receive. Thus while in no way detracting from the contribution which these estimable institutions make toward the alleviation and cure of the ills of mankind, a proper appraisement of the question involved impels the candid statement that the hospitals receive payment for their contribution. The phrase "charitable hospital", therefore, must be accepted in this litigation as meaning the beneficiary of an immunity allowed to it by law and not because it offers gratuitous services to those who avail themselves of its facilities.

*Charity* is a word having such a noble, even reverent, denotation and connotation, that it must be specifically understood that it is not being used in this Opinion in its pure and pristine sense. If, as in one of the cases before us, a patient pays for an operation to cure an ailment with which he is afflicted and, instead, is operated on for a malady which he does not have, and he may not recover against the hospital responsible for the resulting shocking mistake, a question naturally arises as to whether the word "charity" has any place at all in our discussion.*

The lower courts in the two cases under consideration had no choice but to enter nonsuits because, athwart the avenue of their independent thinking, stood the insuperable barrier of the *Knecht* case. And it will continue to rear its unscalable masonry of precedent unless the tremendous power of this Court sets it aside.

That is the immediate and, really, the only question in these appeals, but stating the question simply is not to dispose of it simply. *Knecht* represents a judicial policy which this Court has heretofore expressed, and reiterates today must not be changed. This Court has

---

* "But charity will never be true charity unless it takes justice into constant account . . . and let no one attempt with trifling charitable donations to exempt himself from the great duties imposed by justice." (Pope Pius XI in encyclical letter "Divini Redemptoris"—Paulist Press Ed. pp. 22, 23.)

assumed that that judicial policy is a fortress of authority which cannot and should not be dismantled since it was built a long time ago.

The Concurring Opinion in the *Knecht* case stated: " 'The immunity of an eleemosynary institution from tort liability has long been the established rule in Pennsylvania.' ", and it then cited, in support of this statement, the cases of *Bond v. Pittsburgh,* 368 Pa. 404; *Siidekum v. Animal Rescue League,* 353 Pa. 408; *Gable v. Sisters of St. Francis,* 227 Pa. 254; *Fire Insurance Patrol v. Boyd,* 120 Pa. 624; *Betts v. Young Men's Christian Association of Erie,* 83 Pa. Superior Ct. 545. The earliest of these cases is *Fire Insurance Patrol v. Boyd,* 120 Pa. 624, which was decided in 1888, but is 1888 so long ago that what was said then must be treated today with unquestioning veneration?

It is contended by the appellants here that the doctrine of immunity from tort liability on the part of charitable institutions is an ancient one and they point to what this Court said in the *Boyd* case, namely, "This doctrine is hoary with antiquity and prevails alike in this country and in England where it originated as early as the reign of Edward V., and it was announced in the Year Book of that period."

It is not enough, however, in order to sustain a given principle of law to say that it is "hoary with antiquity", and stop there. No greater harm could befall the progress of the human race than for succeeding generations to point to what was said in a preceding generation without any one taking the trouble to ascertain whether what was said by the preceding generation was correct. The fact of the matter is that when the *Boyd* case was decided, the doctrine therein pronounced as one of hoary antiquity and as prevailing in England at the time had already been repudiated by England.

The most melancholy observation that can be made on the doctrine of charitable immunity in America is

that it is founded on a wholly inaccurate historical conception, to which the years and decades have added additional error and ever-mounting confusion. The genesis of the immunity rule was sheer dictum in an English case which had nothing to do with personal injuries at all. (*Duncan v. Findlater*, 1839, 6 Clark & Fin. 894). In 1846, the same judge, Lord Cottenham, who had spoken in *Duncan v. Findlater*, repeated his dictum in the case of *Feoffees of Heriot's Hospital v. Ross*, 12 Clark & Fin. 507, declaring: "To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose."

This case had to do with damages for wrongful exclusion from the benefits of the charity in question and had no reference to one who had been injured through a tort committed by the charity. As inapplicable as this dictum would be to the question of charitable immunity as we understand it in America, it does not even have the virtue of kinship to our problem as it arose later, because Lord Cottenham's dictum in *Duncan v. Findlater* was overruled in 1886 by *Mersey Docks Trustees v. Gibbs*, L.R. 1 H.L. 93, and what was said in 1861 in *Holiday v. St. Leonard* on the same subject was repudiated in 1871 by the case of *Foreman v. Mayor of Canterbury*.

Thus, by the beginning of the fourth quarter of the nineteenth century all that had been said on the subject of deviating trust funds for the payment of damages had been wiped out of the jurisprudence of England.

Obviously unaware of what had happened in England in this field, Massachusetts in 1876 proceeded to build on a foundation which did not exist. Taking the *Holliday v. St. Leonard* case as its premise, the Supreme Court of Massachusetts in the case of *McDonald*

*v. Massachusetts General Hospital,* 120 Mass. 432, an-
nounced for the first time in America the so-called
charity immunity doctrine. In 1885, Maryland, in the
case of *Perry v. House of Refuge,* 63 Md. 20, added to
the superstructure of the foundationless structure be-
gun by Massachusetts. In 1888 Pennsylvania brought
its blocks of stone and mortar, in the case of *Fire In-
surance Patrol v. Boyd,* supra, for still another higher
addition to this pile which now was starting skyward.
In the *Boyd* case, this Court spoke with approval of the
Massachusetts case, which it could see, and with equal
approval of the *Feoffees of Heriot's Hospital* case, which
had been wiped out. So sure was the 1888 Supreme
Court of the solidity of its foundation in the *Boyd* case
that it addressed itself sardonically to a decision of the
Supreme Court of the State of Rhode Island which,
with a wisdom and courage in inverse proportion to its
geographical size, declared that a maltreated hospital
patient was entitled to recover for damage done him.
Justice PAXSON, speaking for this Court, derided Rhode
Island: "I will not consume time by discussing the case
of Glavin v. Rhode Island Hospital, 12 R. I. 411, which,
to some extent, sustains the opposite view of this ques-
tion. There, a hospital patient paying eight dollars
per week for his board and medical attendance, was al-
lowed to recover a verdict against the hospital for un-
skilful treatment, and it was held that the general trust
funds of a charitable corporation are liable to satisfy
a judgment in tort recovered against it for the negli-
gence of its officers or agents. It is at least doubtful,
whether under its facts the case applies, and if it does,
we would not be disposed to follow it in the face of the
overwhelming weight of authority the other way, and
of the sound reasoning by which it is supported."

Justice PAXSON could be convinced of the "sound
reasoning" of his position, but there was no more evi-
dence in 1888 that the charity immunity doctrine was

supported by an "overwhelming weight of authority" than that (as he also said), the doctrine was one of hoary antiquity. Something said in 1846 can scarcely acquire moss of "hoary antiquity" by 1888.

Nevertheless, the immunity doctrine began to grow in the United States. Other states followed Massachusetts, Maryland and Pennsylvania, each one speaking of the antiquity of the rule and assuming, as the tower of authority rose, that the doctrine it proclaimed was sunk in the solid rock of historical fact, ballasted with granitic reason and buttressed with ever-accumulating precedent. No one can tell how many persons were injured and even allowed to die in hospitals through the neglect of attendants (with no recourse against the hospital) as this tower of assumed purity pushed toward the clouds.

In the early part of the twentieth century, however, some cracks began to show in the tower and then in 1942, Judge RUTLEDGE (later Justice of the Supreme Court of the United States) of the United States Court of Appeals for the District of Columbia revealed, in perhaps the most searching, analytical, and penetrating opinion on the subject, that the charity immunity doctrine was built on a foundation of sand. As one reads and reflects on that opinion (*Georgetown College v. Hughes,* 130 F. 2d 810), he is forced to the irresistible conclusion that the immunity doctrine began in error, lifted its head in fallacy, and climbed to its shaky heights only because few dared to question whether charity was really charity.

Judge RUTLEDGE ended his brilliant dissertation on the immunity doctrine with the incontrovertible proposition that: "The incorporated charity should respond as do private individuals, business corporations and others, when it does good in the wrong way."

Some courts, overawed by the word *charity,* and yet uneasy about the manner in which its impeccable, white

mantle concealed gross negligence and even wanton misdeeds, sought to find a way to hold hospitals for the torts of its employees without abrogating the immunity doctrine. Accordingly they began to distinguish between acts which were designated administrative, in which the hospitals would be liable, and acts which were medical, where the rule of immunity would still apply. This was particularly true in the State of New York. Many strange decisions followed this artificial attempt to separate the sheep of immunity from the goat of liability. Thus, in *Iacono v. New York Polyclinic Medical School*,[1] the Court held that applying an improperly capped hot water bottle to a patient's body was an administrative act for which the hospital was liable, but that keeping a hot water bottle against a patient's body for an excessive period of time was purely medical and the hospital was not liable.[2] Where, in *Necolayff v. Genessee Hospital*,[3] a transfusion of blood was given to the wrong patient, the Court held that the hospital was liable because this was an administrative act, but where the wrong blood was pumped into the veins of the right patient, the mistake was strictly medical, and the hospital was not liable.[4] Where the hospital attendants failed to put up sideboards on a bed, after they had been medically ordered, and the patient fell out, the hospital was held liable since this was administrative negligence,[5] but where the medical person in charge failed to order sideboards and they were needed, the Court decided that this was a medical mistake, and the hospital did not need to respond to the lawsuit of the patient who was injured because of this medical lapse.[6]

---

[1] 296 N. Y. 502.

[2] *Sutherland v. N. Y. Polyclinic*, 298 N. Y. 682.

[3] 296 N. Y. 936.

[4] *Berg v. N. Y. Society*, 1 N. Y. 2d 499.

[5] *Ranelli v. Society of N. Y. Hospital*, 295 N. Y. 850.

[6] *Grace v. Manhattan*, 301 N. Y. 660.

Eventually the Court of Appeals of New York called a halt to this checkered reasoning, which was making a multicolored quilt of the whole law on tort liability in hospitals, and, in a brave, scholarly opinion, authored by the illustrious Judge FULD, the highest Court of the Empire State repudiated the entire doctrine of so-called charitable immunity. Speaking for the Court in the case of *Bing v. Thunig*, 2 N.Y. 2d 656, Judge FULD said: "The doctrine of *respondeat superior* is ground on firm principles of law and justice. Liability is the rule, immunity the exception. It is not too much to expect that those who serve and minister to members of the public should do so, as do all others, subject to that principle and within the obligation not to injure through carelessness. It is not alone good morals but sound law that individuals and organizations should be just before they are generous, and there is no reason why that should not apply to charitable hospitals. 'Charity suffereth long and is kind, but in the common law it cannot be careless. When it is, it ceases to be kindness and becomes actionable wrongdoing' . . . Insistence upon *respondeat superior* and damages for negligent injury serves a two-fold purpose, for it both assures payment of an obligation to the person injured and gives warning that justice and the law demand the exercise of care."

Our Court has so far failed to do what the United States Court of Appeals of the District of Columbia and the Court of Appeals of New York, in the two cases just cited, have done, namely, inquire whether the immunity doctrine is grounded in "good morals and sound law." It has been content to refer to previous decisions as if yesteryear could do no wrong and as if the hand of the past must forever clutch the helm of the present. In none of the cases cited in the *Knecht* decision, as authority for that judgment, was any attempt made to justify in moral law and fair dealing the immunity

which deprived the plaintiff of damages for the injuries inflicted upon him or her.

Thus, in *Gable v. Sisters of St. Francis,* 227 Pa. 254, hospital attendants negligently placed in the bed of the unconscious plaintiff some leaking hot water bags, seriously disabling her. She was a paying patient. This Court in denying recovery said: "It is wholly immaterial that the plaintiff who here complains of injury was admitted as a pay patient."

In *Siidekum v. Animal Rescue League,* 353 Pa. 408, the plaintiff's decedent was killed through the negligence of the driver of a truck of the Animal Rescue League of Pittsburgh. This Court held that the Animal Rescue League was not responsible for the negligence of its servant because "as a non-profit organization engaged in the humane undertaking of caring for animals, all of its capital funds and income being used for that purpose, (it) is a purely public charity."

The care of animals is undoubtedly an enterprise which merits the support of all citizens in any well-organized society, but is the protection of human beings on the streets any less an obligation of society? It may be added here that the defendant Animal Rescue League operated under a contract with the City of Pittsburgh from which it received more than one-half of its total income. Also, it carried liability insurance.

In *Bond v. Pittsburgh,* 368 Pa. 404, the City of Pittsburgh sought to recover from the Society of St. Vincent de Paul an amount it had to pay out because of injuries sustained by the plaintiff who fell on a defective pavement in front of the premises of the Society. This Court in holding the society immune from liability declared that: "Notwithstanding the violent criticisms that have been directed by academic legal writers against the doctrine of the immunity of charitable organizations *from tort liability, and notwithstanding* also the fact that there is considerable conflict in the

judicial decisions on the subject among the several States, our own Commonwealth has, from the earliest times, stood firm in its adherence to the principle of immunity."

Here again this Court speaks of "earliest times." Is 1888 "earliest times"?

In *Betts v. Y.M.C.A. of Erie,* 83 Pa. Superior Ct. 545, Catherine Betts was seriously injured when a large chandelier in the lobby of the defendant's building fell on her. The Superior Court denied liability because the object of the Y.M.C.A., the Court said, "is, primarily, the spiritual, mental and physical welfare and improvement of young men :". But what of the physical welfare of the young woman Catherine Betts?

In the *Knecht* case itself, the plaintiff was injured when hospital attendants negligently directed her to walk when she was incapable of walking and she fell to her injury. She sued the hospital and was non-suited, not because she failed to prove negligence or because there was any evidence of contributory negligence but, because, as previously indicated, this Court said, "The immunity of an eleemosynary institution from tort liability has long been the established rule in Pennsylvania."

Hence, we come to the crucial question posed by the immunity rule in Pennsylvania, namely, should it be retained because it is a "long established rule?" In a word, we are confronted with stare decisis. Of course, stare decisis is a salutary principle. Without it, there would be no stability in the law. The ship of the law should follow that well-defined channel which, over the years, has been proved to be safe and trustworthy. But it does not comport with wisdom to say that when shoals rise in a heretofore safe course, and rocks emerge to encumber the passage, the ship should pursue the original course merely because it presented no hazard in the past. The doctrine of stare decisis does not de-

mand that we follow precedents which experience proves now violate accepted principles of justice.

Stare decisis is not an iron mold into which every legal principle must be poured where, like wet concrete, it acquires an unyielding rigidity which nothing later can change. "Notwithstanding the rule of stare decisis . . . the courts have the power, and frequently exercise it, of departing from rules which have been previously established . . . and it is the manifest policy of our courts to hold the doctrine of stare decisis subordinate to legal reason and justice. . .": 14 Am. Jur., Courts, section 124, page 341.

Justice CARDOZO said: "When changes of manners or business have brought it about that a rule of law which corresponded to previously existing norms or standards of behavior, corresponds no longer to the present norms or standards, but on the contrary departs from them, then those same forces or tendencies of development that brought the law into adaptation to the old norms and standards are effective without legislation, but by the inherent energies of the judicial process to restore the equilibrium." (Cardozo, Paradoxes of Legal Science 14-15.)

The history of law through the ages records numerous inequities pronounced by courts because the law of the day sanctioned them. Reason revolts, humanity shudders, and justice recoils before much of what was done in the past under the name of law. Yet, we are urged to retain a wholly illogical doctrine of immunity because it is an old doctrine. This kind of reasoning would have retained prosecution for witchcraft, imprisonment for debt and hanging for minor offenses which today are hardly regarded as misdemeanors.

Chief Justice VON MOSCHZISKER of this Court said: ". . . if, after thorough examination and deep thought, a prior judicial decision seems wrong in principle or manifestly out of accord with modern conditions of life,

it should not be followed as a controlling precedent."
(von Moschzisker, Stare Decisis in Courts of Last Resort, 37 Harv. L.R. 409 at p. 414.)

The law at one time proclaimed and upheld the rule (proved a million times to be wrong) that the king can do no wrong. In America the rule was changed to read that the government could do no wrong. Then it was said that hospitals could do no wrong, but all the while unoffending persons were being injured, crippled, and even killed through the negligence of government employees and hospital employees; and recovery was constantly being denied the victims or the victims' families because of so-called rules of immunity which have no place in a code of equality and justice.

It is historically true, and it is a tribute to the soundness of the human heart that it *is* true, that there was a time when good men and women, liberal in purse and generous in soul, set up houses to heal the poor and homeless victims of disease and injury. These benefactors made no charges for this care. They felt themselves richly rewarded in the knowledge that they were befriending humanity. Hospitals then were little better than hovels in which the indigent were gathered for the primitive cures available. The wealthy and the well-to-do were cared for in their homes. The hospital or infirmary was more often than not part of the village parish. Charity in the biblical sense prevailed.

And if it happened that some poor mortal was scalded by a sister of mercy who, exhausted from long hours of vigil and toil, accidentally spilled a ladle of hot soup on a hand extended for nourishment, there was no thought of lawsuits against the philanthropists who made the meager refuge possible. But if, following such a mishap, litigation should have been initiated in the courts, it is not difficult to understand why judges would be reluctant to honor such a complaint, convinced, on the basis of humanity, that an enterprise

utterly devoid of worldly gain should be exempt from liability. A successful lawsuit against such a feeble structure might well have demolished it and have thus paralyzed the only helping hand in a world of unconcern for the rag-clothed sick and the crutchless disabled.

The situation today is quite different. Charitable enterprises are no longer housed in ramshackly wooden structures. They are not mere storm shelters to succor the traveler and temporarily refuge those stricken in a common disaster. Hospitals today, to a large extent, are mighty edifices in brick, stone, glass, and marble. They maintain large staffs, they use the best equipment that science can devise, they utilize the most modern methods in devoting themselves to the noblest purpose of man, that of helping one's stricken brother. But they do all this on a business basis, and properly so.

It is true that many of them receive financial aid from public-spirited citizens as well as from the government, but their venture is always a business one. This is not said in derogation but in commendation. Hospitals must be operated on a commercial basis if they and their patients are to survive. Accordingly, charges are made for services rendered and when patients neglect payment, the hospital properly calls in the law to effect collection.

And if the hospital is a business for the purpose of collecting money, it must be a business for the purpose of meeting its obligation. One of those obligations is to exercise a high degree of care for its patients. To the extent that it fails in this care, it should be liable in damages as any other business institution is. If a hospital nurse negligently leaves a sponge in the abdominal cavity of a paying patient, why should the hospital be exempt from liability, any more than a restaurant owner should escape liability for the dam-

age inflicted by a waitress who negligently overturns a tray of dishes on a guest?

Many States have jettisoned the policy of non-liability.

In repudiating the doctrine of immunity in Vermont, its Supreme Court excellently reasoned: "Private charities are much different now than when the liability question was first before the courts. Then they were largely small institutions, many connected with churches, and of limited means. Today they have become, in many instances, big businesses, handling large funds, managing and owning large properties and set up by large trusts or foundations. It is idle to argue that donations for them will dry up if the charity is held to respond for its torts the same as other institutions or that the donors are giving the funds or setting up large foundations for charitable purposes with the expectation that the charities they benefit will not be responsible like other institutions for negligent injury. Such charities enjoy endowments and resources beyond anything thought of when the matter of immunity was first being considered." (*Foster v. Roman Catholic Diocese of Vermont,* 116 Vt. 124.)

The policy of immunizing any person or institution from liability for fault runs counter to our whole system of democratic society because it sanctions special privilege which no one can seriously support legally, philosophically, ethically, or morally. In fact, the Constitution of Pennsylvania specifically prohibits the General Assembly from "Granting to any corporation, association, or individual any special or exclusive privilege or immunity. . ." Obviously what is denied to the Legislature in a matter of governmental policy may not be undertaken by the Courts.

Aside from the reasons which disclose the legal untenability of the immunity doctrine, an awareness of practical conditions demonstrates how in many ways it

is also socially unsound. Human nature being what it is, administrators of a hospital, cognizant that the hospital is insulated from tort liability, may be less likely to exercise stringent scrutiny in selecting personnel than if the hospital were held financially responsible for slipshod, indifferent, and neglectful conduct of employees. As Justice RUTLEDGE said in the *Georgetown* case, supra, "immunity tends to foster neglect while liability tends to induce care and caution."

In the case of *Parker v. Port Huron Hospital*, 105 N.W. 2d 1, a hospital attendant negligently confused blood tubes and, as a result, the plaintiff's decedent received the wrong blood transfusion which caused her death, after thirteen days of torturing pain. The administrator of her estate brought an action against the hospital, charging it with employing and retaining "proven inefficient and incompetent employees". It was admitted by the defendant hospital that the negligence of one of its employees, acting within the scope of her employment, caused the death of Mrs. Parker. Nevertheless it defended on the basis that it was immune from liability because it was a charitable institution. The Supreme Court of Michigan, in rejecting this position, and thereby accepting the modern view on the duty owed by hospitals to the public, declared that "Today charity is big business. It often is corporate both in the identity of the donor and in the identity of the donee who administers the charity. Tax deductions sometimes make it actually profitable for donors to give to charity. Organized corporate charity takes over large areas of social activity which otherwise would have to be handled by government, or even by private business. Charity today is a large-scale operation with salaries, costs and other expenses similar to business generally. It makes sense to say that this kind of charity should pay its own way, not only as to its of-

fice expenses but as to the expense of insurance to pay for torts as well. . .

"It is our conclusion that there is today no factual justification for immunity in a case such as this, and that principles of law, logic and intrinsic justice demand that the mantle of immunity be withdrawn. The almost unanimous view expressed in the recent decisions of our sister States is that insofar as the rule of immunity was ever justified, changed conditions have rendered the rule no longer necessary."

In considering the general question of hospital immunity, the inevitable query arises as to why it is that a practicing doctor who employs other doctors and attendants is responsible for the tortious conduct of his agents, servants and employees, but a hospital which performs the same services, only on a larger scale, is excused from liability for the negligence of its medical staff and employees. The hospital uses and maintains a larger staff than the private practitioner only because it serves more people. In serving more people it, of course, collects a larger revenue. Certainly its liability should not be less because its income is more.

We have seen that the immunity doctrine was founded in error, continued in misapprehension, and defended practically entirely alone on the basis of longevity. It violates logic, offends equity, and ignores legal consistency in many ways. Thus, although a charitable hospital is not required to pay for its negligent acts in the treatment of patients it is required to pay for its negligent attitude toward neighbors. In other words it may be sued and be required to answer for committing and maintaining a nuisance. (25 A.L.R. 2d 52.) Broadly speaking nuisance sounds in tort, and if a hospital must pay for damage done to inanimate property, why should it not be required to pay for damage done to human bodies? This situation reveals an incongruity which does the law no credit.

If A, a hospital attendant, carelessly and negligently empties a bucketful of scalding water on B and C (B being another hospital attendant and C a patient), the hospital will pay B workmen's compensation for his injuries resulting from A's misconduct, but the paying patient, equally injured in the same misadventure, will receive nothing but further pain and, in addition, a further burden of expense to carry on his blistered back. Is this consistency?

It is argued that a charitable hospital is committed to ministering to the halt, the lame and the blind, and, therefore, should not be subjected to lawsuits which might impede it in providing for those entrusted to its care. But is a patient who is injured by the negligence of the hospital not also one of the halt, the lame, and the blind? Why should he be excluded from the solicitude of the hospital because he is more halt, more lame, and more blind than he was when he entered the hospital, all due to the hospital's fault? Is this charity?

But the immunity doctrine is indefensible for a more momentous reason than anything expressed up to this point. The right of Kenneth Michael to recover for the trespass perpetrated upon him is a property right. The medical expenses he must pay, the wages which he has lost, the impairment of earning power he will suffer, and the pain, suffering and inconvenience he has undergone and will still undergo are all transmutable into dollars and cents which he has a right to obtain in an action at law. To deny him that recovery is to take property without just compensation, a despoliation prohibited by the Constitution.

Mrs. Juliano, widow of William Juliano, has a property right in what was taken from her through the death of her husband and breadwinner. Her two children have a right to parental maintenance with which their father would have supplied them had he not been killed as a result of the negligence of the defendant-

hospital. To deprive Mrs. Juliano and her children of what the law assures all widows and orphans victimized through the negligence of others is a denial of due process of law guaranteed by the Constitution.

Counsel for the Hahnemann Hospital, arguing that the immunity doctrine is a matter of "public policy," says: "One example of this public policy as established by the legislature is the exemption of such organizations from taxation. Exempting charitable organizations from tort liability is but another phase of that same public policy."

It is true that the Constitution of Pennsylvania permits the General Assembly to exempt charitable institutions from payment of taxes (Art. IX), but in doing so, it does not establish any "public policy" which exempts charitable institutions from liquidation of their private debts. The Legislature may relieve these organizations from taxation because taxes are public funds; they belong to the Commonwealth; they are property of the sovereignty of the Commonwealth, for which the General Assembly speaks.

The Constitution specifically authorizes the Legislature to remit taxes which would otherwise be due from hospitals like all other businesses, but there is nothing in the Constitution which would authorize the Legislature to exempt a hospital or any person, corporation, or institution from meeting private obligations. The Legislature may not exempt a hospital from paying for buildings it constructs, personnel it employs, and groceries it purchases. The Legislature would have no authority to exempt a charitable institution from making restitution of an article stolen by one of its employees for its use, or, if the article has been destroyed, from making payment for the value of the article.

And if the Legislature cannot save a charitable institution from its legal obligation to restore what it has not paid for, it may not, by the same token, exempt

such an institution from making restitution in damages for what it has taken from a tortiously injured person.

As a hospital could be compelled by law to restore to a patient clothes or valuables it had removed from him while he was in the hospital, it should be compelled to restore to him the wages and bodily vigor (or its monetary equivalent) it caused him to lose through its negligent conduct.

What the immunity doctrine actually does is to force the victim of negligence to make a contribution of what is his own to the hospital. The unconscionable character of such coercion does not need to be elaborated on.

And, it needs scarcely to be added, that what the Legislature may not authorize hospitals to do, the courts may not similarly authorize.

The argument that if the immunity which hospitals have heretofore enjoyed is to be abrogated it must be done by the Legislature is a bold one. It is like saying that if trespassing on property is to cease, the Legislature must declare trespassing illegal. But trespassing already is illegal. Indeed, the Legislature would never have had the power to pronounce trespassing legal because this would in effect be permitting the use of someone else's property without due process of law and without just compensation.

In any event, the proposition that the Legislature and not the courts should remove the immunity, if it is to be removed, is additionally meritless because as already stated, and bears repetition, it was this Court and not the Legislature which built the wall of non-liability around so-called charitable institutions; and what it built, it may dismantle.

When the Supreme Court of Washington swept away the immunity rule, it said briefly but cogently: "We closed our courtroom doors without legislative

help, and we can likewise open them." (*Pierce v. Yakima Valley Memorial Hospital Ass'n,* 43 Wash. 2d 162.)

The Commonwealth of Pennsylvania, of course, is not bound by the decisions of any other State or even the decisions of courts of the United States on this particular subject of the law. Nevertheless, we always look with respect on the attitude expressed in other jurisdictions on any specific topic of jurisprudence. With that deferential regard for the views of other courts, it is not a matter of slight reflection that Pennsylvania now stands with a very small minority of the States in upholding total immunity.

Twenty-three States of the Union have wholly rejected the principle of tort immunity for charitable institutions, fourteen States allow a partial immunity, and nine States, of which Pennsylvania is one, allow total immunity. The District of Columbia and Puerto Rico do not sanction immunity. Four States have not passed on the question. Although England, as already indicated, has been charged with originating the immunity doctrine, it quickly repudiated the misunderstood dicta in the *Feoffees of Heriot's Hospital v. Ross* case and has held fast to the liability doctrine ever since. "It is now settled that a public body is liable for the negligence of its servants in the same way as private individuals would be liable under similar circumstances, notwithstanding that it is acting in the performance of public duties, like a local board of health, or of eleemosynary and charitable functions, like a public hospital.": (*Hillyer v. The Governors of St. Bartholomew's Hospital,* 2 K.B. 820, 825 (1909)).

Australia, Canada and New Zealand have followed England in holding charitable institutions liable for the torts of their employees.

It is obvious from the above that the trend of the law is toward the elimination of immunity. This trend

has been recognized in the Restatement (2d), Trusts. The "comment" on subsection (2) of Section 402 reads: "The trend of judicial opinion favors the denying of immunity, putting a charitable organization in the same position as that of non-charitable organizations, subjecting them to liability in tort not only for the negligence of the governing board but also for the negligence of employees, subjecting them to liability to recipients of benefits as well as to other persons."

The subsection (2) itself reads: "A person against whom a tort is committed in the course of the administration of a charitable trust can reach trust property and apply it to the satisfaction of his claim."

All this is in keeping with the Restatement, Torts, which decisively declares in section 887 that: "No one, except the State, has complete immunity from liability in tort."

Pennsylvania should not hold out against this tide of reason and current adjustment to changed conditions any more than did New Jersey when in April, 1958 (subsequent to our *Knecht* decision), it took its place in the roll of States acknowledging the inequity of the immunity rule. (*Collopy v. Newark Eye and Ear Infirmary*, 141 A. 2d 276). In that case the plaintiff underwent eye surgery. Protective bandages were placed over his eyes and in this blindfolded condition he fell out of bed which lacked guardrails, sustaining serious injuries. The defendant hospital took no x-ray pictures to ascertain if and to what extent the patient had been hurt by the fall. He was discharged from the hospital and then, because of the new injuries, he was required to undergo further hospitalization. The lower court entered summary judgment in favor of the hospital since it was declared to be a nonprofit eleemosynary corporation. The Supreme Court of New Jersey reversed, and, in a scintillating opinion by Justice JACOBS, declared: "times and circumstances

have changed and we do not believe that it (the immunity doctrine) faithfully represents current notions of rightness and fairness. Due care is to be expected of all, and when an organization's negligent conduct injures another there should, in all justice and equity, be a basis for recovery without regard to whether the defendant is a private charity. . . The primary function of the law is justice and when a principle of the law no longer serves justice it should be discarded; here the law was embodied not in any controlling statute but in a judicial principle of the law of torts; it had no sound English common law antecedents and found its way into American law through a misconception; it runs counter to widespread principles which fairly impose liability on those who wrongfully and negligently injure others; it operates harshly and disregards modern concepts of justice and fair dealing; it has been roundly and soundly condemned here and elsewhere and *the time has come for its elimination by the very branch of government which brought it into our system."* (Emphasis supplied.)

Some feeble attempts have been made to rationalize the immunity doctrine. It has been said, as already indicated, that payment of money for damage claims would be a diversion of trust funds. This rule, of course, was repudiated by the court which presumably gave it birth, but it never had merit anyway. The trust funds of a hospital are intended to care for the patients of the hospital and what could be a more equitable demand on the funds than caring for those patients actually hurt in the hospital?

Then it is contended that the patient waives the right to make claim for injuries sustained in the hospital because he accepts the competency of those who are to operate on him, nurse him, and feed him, but this argument is wholly devoid of reasonableness, to say nothing of fairness, because usually the person who

is brought into a hospital is too ill, weak, or disabled to see, much less appraise, the abilities of those who are to monarchize over him.

It is equally argued that there is an assumption of risk by the person who "seeks and receives the services of a public charity." Even where the charity is a fact and not a figure of speech the patient still has the right to be saved from gross negligence or wanton misconduct, but, as repeatedly stated, practically all the patients in so-called charitable hospitals pay for the services rendered to them.

It is also said that if the immunity doctrine were to be eliminated, prospective donors would cease to open up their check books to charity. Justice RUTLEDGE spoke on this subject in the *Georgetown* case, supra: "No statistical evidence has been presented to show that the mortality or crippling of charities has been greater in states which impose full or partial liability than where complete or substantially full immunity is given. *Nor is there evidence that deterrence of donation has been greater in the former.* Charities seem to survive and increase in both, with little apparent heed to whether they are liable for torts or difference in survival capacity." (Emphasis supplied.)

Then there is the theory of public policy, but, of course, there is no "public policy" involved in making tortfeasors respond to legitimate claims made upon them.

After one examines all the half-hearted, stilted and forced reasons advanced in behalf of the immunity doctrine, one is forced to the conclusion that there is really only one argument which is substantial and sincere, and that is that if hospitals are required to answer for the torts of their employees they will have to make disbursements of monies which heretofore have remained in their treasuries. *But this is a proposition which* could, just as easily, be considered in behalf of rail-

roads, airlines and transit companies. As hospitals are vital to the continuing life of any community, so also are railroads, airplanes and buses indispensable to community, state and nation. Without means for transporting people and cargo, society would inevitably degenerate into the most primitive existence and eventually perish.

However, in spite of this all-vital indispensability of transportation facilities, the companies which pump the lifeblood into the arteries of civilization are constantly the subject of lawsuits, and the damages which they pay become part of the operating expense of the industry.

Whatever outlays hospitals would be subjected to because of trespass actions would naturally become as much a part of the running expenses of the institution as the payment of salaries for employees and the expenditure of funds for supplies.

The defendants in these appeals, and the proponents of the immunity doctrine generally, argue, however, that hospitals are not financially equipped to discharge the obligations which would arise as the result of trespass actions. And here we have come to the principal and, perhaps actually, the only concern of the immunity advocates. All other argument is merely a delaying action or diversionary tactics. How will the hospitals meet the expense which will be added to their budgets if immunity is abrogated? The answer, of course, is that they will meet that expense as all other business enterprises meet similar contingencies. If their treasuries are not sufficiently ample to provide for what may reasonably be anticipated in the liquidation of potential damage claims, they may have recourse to the purchase of liability insurance which is today as much a part of the American way of life as banks, building and loan associations, stocks and bonds, etc.

When the Supreme Court of Ohio repudiated the rule of immunity in that state, it said: "The policy that the funds of a nonprofit hospital should not be diverted for any purpose other than the purpose for which it was organized, causing a depletion of the hospital's resources, and thus immunizing them from liability no longer has any foundation in our present day economy. Under present day conditions a hospital may fully protect its funds by the use of liability insurance." (*Avellone v. St. John's Hospital,* 165 Ohio 467.)

It is significant that the record in the St. Agnes Hospital case before us reveals that the hospital is already provided with liability insurance.

The fear that elimination of immunity would jeopardize the existence and survival of charitable hospitals has been shown to be, in a great measure, illusory. Justice RUTLEDGE met the expression of this apprehension as far back as 1942 and nothing has happened since then to show that his judgment did not measure up to reality. "Further, if there is danger of dissipation, insurance is now available to guard against it and prudent management will provide the protection. It is highly doubtful that any substantial charity would be destroyed or donation deterred by the cost required to pay the premiums. While insurance should not, perhaps, be made a criterion of responsibility, its prevalence and low cost are important considerations in evaluating the fears, or supposed ones, of dissipation or deterrence. What is at stake, so far as the charity is concerned, is the cost of reasonable protection, the amount of the insurance premium as an added burden on its finances, not the awarding over in damages of its entire assets." (*Georgetown v. Hughes,* supra.)

In all the briefs and arguments presented to this Court in the several times the immunity rule has been a matter for our consideration, no attorney for any hospital has advanced data or statistics to give sub-

stance to the self-generated alarm that the elimination of the immunity doctrine would be disastrous to hospitals.

As a final argument, the immunity proponents urge that if the doctrine is to be abrogated, it should be done prospectively, that is to say, this Court should announce that at some specified date in the future, charitable institutions would no longer be permitted to plead non-liability in tort cases. In the meantime, the proponents say, the hospitals would have an opportunity to fortify themselves with appropriate liability insurance against oncoming trespass actions. We have seen that one of the hospitals in these two current cases has already taken out liability insurance and it is not unlikely that the other hospital has done the same.

The question as to whether the immunity doctrine would be abandoned in Pennsylvania is one which has been a matter of public discussion and debate for a long time. Law books, law reviews, periodicals, commentators, lecturers, professors, students have had the matter in focus for decades. It is difficult to believe that most of the institutions which will be involved by the decision in this case have not exercised prudence and provided for an eventuality.

Nor can it be doubted that insurance companies, with business and even commendable zeal, have prevailed upon hospitals to take out insurance against the possibility or even probability that eventually Pennsylvania would acknowledge an obligation accepted by most of the English-speaking world. On that basis they have quite likely been collecting sizeable premiums for liabilities which up to now have not eventualized. The only risk which they have been running is the risk that the immunity doctrine might be eliminated and then they would be called upon to meet the very contingency for which they were accepting premiums. For them the delay in the announcement of the demise of

the immunity doctrine has been a boon of no small proportion. To have them now meet the very condition for which they have insured their patrons would be no hardship to them and certainly not to the insured.

However, putting aside the insurance matter under discussion, a prospective abrogation of the immunity doctrine would be not only unfeasible but unjust. The effect of a just decision cannot be delayed when the need for its remedial force is immediate. To postpone the effective date of the new rule would be like refusing to give medicine to currently ill patients until an army of doctors may be recruited for a possible future epidemic.

Moreover, to postdate the effectiveness of a judicial decree is to take away its judicial character and invest it with the attributes of a legislative fiat. The purpose of the courts is to decide pending litigation and not to declare what the law should be in the future. That type of law-making is delegated to the Legislature by the Constitution. Our Court does not even have the authority to render advisory opinions, much less to produce legislative enactments.

But aside from this academic discussion, a prospective decision would deny to the widow and the two children of William Juliano the right to litigate a claim which we pronounce to be legal and just. A postdated effect of this decision would be to take away from Kenneth Michael a right to recover for the damage done to him by the hospital which authorized the use of a scalpel on the wrong part of his body, after this Court will have announced that his complaint is legal, his claim just, and his right to recovery unquestioned. Such a stultification would be intolerable and would bring the administration of justice into disrepute.

The immunity rule in Pennsylvania has long ago outlived whatever usefulness it may have originally had. Its continuance will only add further unfortu-

nates to those who have already gone uncompensated, for injuries sustained through the negligence of agents, servants and employees of institutions engaged in what is now universally recognized as a highly worthy business enterprise.

I dissent.

———

DISSENTING OPINION BY MR. JUSTICE COHEN:

Beginning with *Fire Insurance Patrol v. Boyd*, 120 Pa. 624, 15 Atl. 553 (1888), and continuing through *Knecht v. St. Mary's Hospital*, 392 Pa. 75, 140 A. 2d 30 (1958), we have granted immunity from liability to eleemosynary institutions for the torts of their agents and employees. We should now overrule these cases and by our action adopt for Pennsylvania the equitable and more rational rule that charities are liable in tort to the same extent as other employers. However, even though the five to two majority of *Knecht v. St. Mary's, Hospital,* supra, has been whittled down to four to three in the instant case, the majority still persist in a fancied fear that severe financial injury will be inflicted on charitable institutions because they have not thought it necessary to insure against a possible reversal of the immunity doctrine. If such a contention had substantial experimental data in its support, it would have been quickly submitted.

I cannot conceive that Pennsylvania hospitals are so improperly managed and so blind to reality that they have not protected themselves against our eventual abandonment of the charitable immunity doctrine. All of our neighboring and contiguous states have modified or discarded the doctrine as unjust and unrealistic. The trend as evidenced by the actions of the rest of the states has been so pronounced that I cannot conceive that the Pennsylvania hospitals have not also recognized the certainty of our eventual reversal. To con-

clude otherwise insults their intelligence and reflects on the ingenuity of the insurance salesmen who long ago alerted hospitals to actualities.

Only as recently as May 5, 1961 the Kentucky Court of Appeals in *Mullikin v. Jewish Hospital Association of Louisville* (Ky.) 348 S.W. 2d 930 (1961), abandoned the immunity doctrine. In so doing the court said, "Upon applying the simple test of right and wrong we are forced to the conclusion that the charitable nature of a wrongdoer should create no exception to the rule of liability," and frankly admits that the doctrine of immunity was based purely on expediency, but "it has not been right, is not now right, nor could it ever be right for the law to forgive any person or any association of persons for wronging any other person." I can only suggest that those who are convinced that the immunity doctrine is wrong continue their efforts to place right before expediency.

The doctrine of charitable immunity was wrong when first enunciated and is wrong now. We should not perpetuate the wrong by relegating to the legislature our responsibility to correct our own mistakes; nor should we hide behind our former decisions " 'made against common justice and the general reason of mankind.' " (See *Knecht v. St. Mary's Hospital*, supra, p. 94, n. 1).

I dissent.

The concurring opinion of Justice BOK compels further comment. To apply Justice BOK's solution would require that we deny recovery to the present litigants but by *dicta* permit recovery to all those who suffer a compensable injury after a date set by this court. *No court in the United States has ever adopted such a solution to the problem.* The courts which abolished the immunity prospectively did so by permitting a cause of action in the litigated case and in cases arising after the date of their opinion. *Kojis v. Doctors Hospital,*

12 Wisc. 2d 367, 107 N.W. 2d 131 (1961) (Supplemental Opinion); *Parker v. Port Huron Hospital*, 361 Mich. 1, 105 N.W. 2d 1 (1960); see also *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 163 N.E. 2d 89 (1959). It is most regrettable that a majority of our court would not at least do likewise.