Flagiello, Appellant, *v.* Pennsylvania Hospital.

Argued November 18, 1964. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*Stephen M. Feldman,* with him *Joseph G. Feldman,*
for appellants.

*John J. Dautrich,* with him *Michael H. Malin,* and *White & Williams,* for appellees.

*Spencer G. Nauman, Jr., Spencer G. Hall,* and *Nauman, Smith, Shissler & Hall,* for amicus curiae.

OPINION BY MR. JUSTICE MUSMANNO, March 22, 1965:

Mrs. Mary C. Flagiello was injured in the Pennsylvania Hospital in Philadelphia under circumstances which, considering the nature of the legal problem before us, do not at present call for expatiation. It is enough to say that she avers that, through the negligence of two employees of the hospital, she was caused to fall, sustaining in the fall a fracture to her right ankle, and, that this injury, entirely unrelated to the ailment which brought her into the hospital originally, necessitated further hospital and medical care which subjected her husband to great medical expense and inflicted upon her pain and suffering as well as impairment of earning power. She and her husband, Thomas Flagiello, brought an action in trespass against the hospital and the two employees alleged to have been immediately responsible for the accident. The defendant hospital answered that it was an eleemosynary institution engaged in charitable enterprise and, therefore, not responsible in damages to the plaintiffs. The plaintiffs replied to the new matter, declaring that Mrs. Flagiello was not a charity patient but a paying patient in the hospital. The hospital moved for judgment on the pleadings and it was granted.[1]

The plaintiffs then instituted an action of assumpsit against the hospital, stating that they had entered into a contract with the hospital whereby they were to pay $24.50 a day for hospital facilities and nursing

---

[1] The action was discontinued as to the remaining defendants.

care, but that the hospital did not fulfill its obligations under the contract because it failed to provide reasonably fit and adequate care for the wife-plaintiff, as the result of which she sustained fresh injuries and her husband plaintiff was required to pay to the hospital $2,906.68 for medical care and maintenance.

The plaintiffs stated also that the defendant "carries public liability insurance which covers the present claim and that at least 96% of all state aided hospitals in Pennsylvania carry such public liability insurance. Further, defendant's charitable operations are supported mainly by state aid and from the fees paid by non-charitable patients rather than from private charitable contributions."

The defendant hospital moved for judgment on the pleadings, asserting that assumpsit did not lie and that "under the law of Pennsylvania, the existence of liability insurance or the fact that a patient is a paying patient is of no consequence in denying the eleemosynary nature of the institution."

The Court granted the motion, and plaintiffs have appealed in both cases, which have been consolidated for consideration here.

The hospital has not denied that its negligence caused Mrs. Flagiello's injuries. It merely announces that it is an eleemosynary institution, and, therefore, owed no duty of care to its patient. It declares in effect that it can do wrong and still not be liable in damages to the person it has wronged. It thus urges a momentous exception to the generic proposition that in law there is no wrong without a remedy. From the earliest days of organized society it became apparent to man that society could never become a success unless the collectivity of mankind guaranteed to every member of society a remedy for a palpable wrong inflicted on him by another member of that society. In 1845 Justice STORRS of the Supreme Court of Connecti-

cut crystallized into epigrammatic language that wise concept, as follows: "An injury is a wrong; and for the redress of every wrong there is a remedy: a wrong is a violation of one's right; and for the vindication of every right there is a remedy." (*Parker v. Griswold*, 17 Conn. 288, 303.)

The defendant hospital here does not dispute, as it indeed cannot, this fundamental rule of law, but it says that if the plaintiffs are allowed to invoke a remedy for the wrong done them, the enactment of that remedy will impose a financial burden on the hospital. Is that an adequate defense in law?

The owner of a hotel may not plead non-liability in a trespass action because, if it has to make payment, the hotel will be thrown into debt. A municipality cannot escape liability in law by reasoning that taxpayers would protest if it had to pay damages for injuries incurred by a pedestrian who falls into a defect in a negligently maintained street. A transit company cannot avoid payment of damages by explaining that it might be put out of business if it had to pay all the verdicts rendered against it as the result of negligence on the part of its employees.

On what basis then, may a hospital, which expects and receives compensation for its services, demand of the law that it be excused from responding in damages for injuries tortiously inflicted by its employees on paying patients? There is not a person or establishment in all civilization that is not required to meet his or its financial obligations, there is not a person or establishment that is not called upon by the law to render an accounting for harm visited by him or it on innocent victims. By what line of reasoning, then, can any institution, operating commercially, expect the law to insulate it from its debts?

The hospital in this case, together with the Hospital Association of Pennsylvania, which has filed a brief

as amicus curiae, replies to that question with various answers, some of which are: it is an ancient rule that charitable hospitals have never been required to recompense patients who have been injured through the negligence of their employees; the rule of stare decisis forbids that charitable hospitals be held liable in trespass cases; if the rule of charitable immunity is to be discarded, this must be done by the State Legislature; and that since hospitals serve the public, there is involved here a matter of public policy which is not within the jurisdiction of the courts.

What is a charitable institution? Charity is defined in Webster's dictionary as: "Whatever is bestowed gratuitously on the needy or suffering for their relief."

"Acts of benevolence to the poor."

Whatever Mrs. Flagiello received in the Pennsylvania Hospital was not bestowed on her gratuitously. She paid $24.50 a day for the services she was to receive. And she paid this amount not only for the period she was to remain in the hospital to be cured of the ailment with which she entered the hospital, but she had to continue to pay that rate for the period she was compelled to remain in the hospital as a result of injuries caused by the hospital itself.[2]

Thus, as a matter of integrity in nomenclature it must be stated that, although the hospitals here under discussion are known as charitable hospitals, it does not follow that they offer their services through the operation of charity.[3] While in no way detracting from

---

[2] Of course, when this case comes to trial, the hospital will have the fullest opportunity to prove that it was not negligent, but, so far as the legal problem here under discussion is concerned, the averments in the complaint must be accepted as true.

[3] "But charity will never be true charity unless it takes justice into constant account . . . and let no one attempt with trifling charitable donations to exempt himself from the great duties im-

the contribution which these estimable institutions do make toward the alleviation and cure of the ills of mankind, a proper appraisement of the issue on appeal impels the candid statement that the hospitals do receive payment for that contribution, and, where a hospital is compensated for services rendered, it cannot, if language is to mirror reality, truly be called a charity hospital.

In 1960 the Supreme Court of Michigan, in repudiating the immunity rule, said in the case of *Parker v. Port Huron Hospital*, 361 Michigan 1, 105 N.W. 2d 1: "The old rule of charitable immunity was justified in its time on its own facts. Today we have a new set of facts. It is true that the new facts are still described by the same word in our English language— 'charities'—but that is because our language has not changed as the facts of our life have changed. We have new facts described by old nomenclature. To say that the old rule of law still applies is to reach a result on the basis of nomenclature, not of facts; it is to apply a rule, proper in its time, to completely new facts, and to justify doing so by reference to language merely without regard to the facts."

In its motion for judgment on the pleadings the defendant said: "the fact that a patient is a paying patient [in what is otherwise a charitable hospital] is of no consequence in denying the eleemosynary nature of the institution."

To say that a person who pays for what he receives is still the object of charity is a self-contradiction in terms. In the early days of public accommodation for the ill and the maimed, charity was exercised in its pure and pristine sense. Many good men and women, liberal in purse and generous in soul, set up houses to

posed by justice." (Pope Pius XI in encyclical letter "Divini Redemptoris"—Paulist Press Ed. p. 22, 23.)

heal the poor and homeless victims of disease and injury. They made no charge for this care. The benefactors felt themselves richly rewarded in the knowledge that they were befriending humanity. In that period of sociological history, the hospitals were havens mostly for the indigent. The wealthy and the so-called middle class were treated in their homes where usually there could be found better facilities than could be had in the hospitals.[4] The hospital or infirmary was more often than not part of the village parish. Charity in the biblical sense prevailed.

Whatever the law may have been regarding charitable institutions in the past, it does not meet the conditions of today. Charitable enterprises are no longer housed in ramshackly wooden structures. They are not mere storm shelters to succor the traveler and temporarily refuge those stricken in a common disaster. Hospitals today are growing into mighty edifices in brick, stone, glass and marble. Many of them maintain large staffs, they use the best equipment that science can devise, they utilize the most modern methods in devoting themselves to the noblest purpose of man, that of helping one's stricken brother. But they do all this on a business basis, submitting invoices for services rendered—and properly so.

And if a hospital functions as a business institution, by charging and receiving money for what it offers, it must be a business establishment also in meeting obligations it incurs in running that establishment. One of those inescapable obligations is that it must exercise a proper degree of care for its patients, and, to the extent that it fails in that care, it should be liable

---

[4] History informs us that at the time of the assassination of Abraham Lincoln, one of the conspirators tried to kill Secretary of State Seward who, although suffering with a fractured jaw, his head in a steel frame, was being cared for, not in a hospital, but at his home.

in damages as any other commercial firm would be liable. If a hospital employee negligently leaves a sponge in the abdominal cavity of a paying patient, why should the hospital be freed from liability, any more than a restaurant owner should escape responsibility for the damage inflicted by a waitress who negligently overturns a tray of hot dishes on a guest?

A person may recover damages if he is injured, as the result of negligence, in a hotel, theater, street car, store, skating rink, natatorium, bowling alley, train or ship, yet he cannot recover if he is hurt in the place where accidents are considered most unlikely to occur —in a hospital, where one goes to be cured of an already existing infirmity and not to be saddled with additional woe and torment. This is indeed the paradox of paradoxes. It has no logic, reason, and, least of all, justice, to support it. And still more paradoxical is the argument that, by refusing recovery to the victim of a hospital's own negligence, one somehow is serving charity!

If there was any justification for the charitable immunity doctrine when it was first announced, it has lost that justification today. In 1960 the Supreme Court of Michigan in the case of *Parker v. Port Huron Hospital*, 361 Michigan 1, said: "It is our conclusion that there is today no factual justification for immunity in a case such as this, and that principles of law, logic and intrinsic justice demand that the mantle of immunity be withdrawn. The almost unanimous view expressed in the recent decisions of our sister States is that insofar as the rule of immunity was ever justified, changed conditions have rendered the rule no longer necessary."

The "comment" on subsection (2), §402 of Restatement (2d), Trusts, reads: "The trend of judicial opinion favors the denying of immunity, putting a charitable organization in the same position as that of non-

charitable organizations, subjecting them to liability in tort not only for the negligence of the governing board but also for the negligence of employees, subjecting them to liability to recipients of benefits as well as to other persons."

The subsection (2) itself reads: "A person against whom a tort is committed in the course of the administration of a charitable trust can reach trust property and apply it to the satisfaction of his claim."

All this is in keeping with the Restatement, Torts, which decisively declares in §887 that: "No one, except the State, has complete immunity from liability in tort."

According to one who has made a study of the subject, there were only 178 hospitals in the United States in 1873.[5] Since then hospitals have been growing in number, size, expansion and service. Entering a hospital was at one time regarded with a measure of awe. Doing so now has become almost a commonplace occurrence, although a highly beneficial one. People go to hospitals not only for curative purposes, but for preventive reasons as well as for check-ups. From 178 hospitals in 1873, the number increased to 7,138 in 1963, with 328 of them in Pennsylvania. These Pennsylvania hospitals contained 119,607 beds and employed 118,797 persons, and their assets were estimated to total $1,570,770,000.[6]

Hospitals today are one of the outstanding features of American life. It is within the memory of most people who have attained the half-century mark that in their youth, childbirth in a hospital was exceptional enough to be big news via the Back Fence Courier in the community from which the parents came. It is now almost news if a child is *not* born in a hospital.

[5] E. H. L. Corwin, The American Hospital 6 (The Commonwealth Fund, N.Y. 1946).

[6] 38 Amer. Hosp. Ass'n J. 492 (August 1, 1964).

According to compiled vital statistics, 97.2% of the children born in the United States in 1962 opened their eyes for the first time in a hospital.[7]

The hospitals have become the birth of a nation. Every ten or fifteen years, a whole new country comes to life in the hospitals of America. A tremendous responsibility rests on those hospitals not to cripple posterity. Every safeguard should be installed, every vigilance must be exercised to protect the lives of the new nation, and one of the most effective safeguards is to provide for penalties in the event of laxity and carelessness in handling new-born citizens. Requiring hospitals to respond in damages for the carelessness of its employees provides the penalty which will insure the installation of safety methods and the enforcement of strict supervision over hospital personnel.

In every way, hospital service has expanded in America. Whereas, in 1940, hospitals accommodated 27,221,530 out-patient visits, the number in 1962 had increased to 99,382,460, with 5,291 out-patient departments rendering the service.[8] Whereas, in 1940, 12,-300,000 people in the United States carried hospitalization insurance, this number had increased to 141,400,-000 in 1962.[9]

The Hospital Association states in its brief that "one out of every eight persons in the United States will be a patient in a hospital this year." Nothing could more strikingly illustrate, than this statement, how indispensably hospitalization has become an integral part of the American way of life. All this makes even more amazing the argument that hospitals enjoy

---

[7] Vital Statistics of the United States, 1962, Table 1-19 (Public Health Svc, Washington, 1964).

[8] 37 Amer. Hosp. Ass'n J. 440 (August 1, 1963).

[9] Source Book of Health Insurance Data, 1963 13 (Health Ins. Institute, N.Y. 1963).

a privileged status, wholly different from that of all other going establishments in this country.

We have seen how originally charitable hospitals devoted all their energies, resources and time to caring for indigent patients. Later, they began to care for paying patients as well. In the case of *Gable v. Sisters of St. Francis,* 227 Pa. 254, this Court pointed out that in 1910, two-thirds of the space of the hospital there in controversy was used for charity patients, and that about 60% of the hospital's income came from charitable donations, while only about 40% of the hospital's income was derived from paying patients. Today this has changed almost completely. In 1963, the fees received from patients in the still designated charitable hospitals throughout Pennsylvania constituted 90.92% of the total income of the hospitals.[10]

But, conceding that it could not operate without its paying patients (of which the wife-plaintiff is one), the defendant hospital still objects to being categorized with business establishments because, it says, the law of charitable immunity is so deeply imbedded in our law and is of such ancient origin that it can only be extirpated by legislative enactment. Leaving aside the fallacy that antiquity ipso facto bespeaks correctness or justice, how ancient is the rule of charitable immunity? And how did the rule ever become law in Pennsylvania?

Each court which has upheld the immunity rule has relied for its authority on a previous decision or decisions, scarcely ever placing the subject for study on the table of self-asserting justice. Thus one pursues the citations retrospectively to see how so strange a doctrine of exemption ever became engrafted on to the negligence law of Pennsylvania, which is not unknown for the common sense which permeates it, as well as

---

[10] 38 Amer. Hosp. Ass'n J. 492 (Aug. 1, 1964).

the technological exactness which generally underlies it. Despite the claims of the supporters of the immunity rule that it is an ancient one, it did not really break through the crust of Pennsylvania's jurisprudence until 1888 in the case of *Fire Insurance Patrol v. Boyd,* 120 Pa. 624. In that case, Justice PAXSON said that the charitable immunity rule "is hoary with antiquity and prevails alike in this country and in England." In support of this assertion he cited the case of *Feoffees of Heriot's Hospital v. Ross,* 12 Clark & Fin. 506, decided in 1846, which had rested on *Duncan v. Findlater,* decided in 1839, 6 Clark & Fin. 894.

Speaking for the English Court, Lord Cottenham had pronounced in both cases that: "To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose."

Apart from the fact that this statement was made in 1839 and therefore could lay no claim, in 1888, to "antiquity", it was extraneous to the question as to whether a person injured through a tort committed by a charitable institution could recover against the institution. But even if it be assumed that the question bore some relationship to the problem under consideration in *Fire Insurance Patrol v. Boyd* it still was of no authoritative weight at that time because Lord Cottenham's pronouncement had been repudiated in 1866 in *Mersey Docks Trustees v. Gibbs,* L.R. 1 H.L. 93, and what was said in 1861 in *Holiday v. St. Leonard,* 11 C.B. N.S. 192, on the same subject was overruled in 1871 by the case of *Foreman v. Mayor of Canterbury,* L.R. 6 Q.B. 214. Thus, the doctrine expounded in *Fire Insurance Patrol v. Boyd,* which depended on *Feoffees,* as authority, was, in fact, not the law in England in 1888. In assumed support of his theory of immunity, Justice PAXSON spoke approvingly of a decision by the

Supreme Court of Massachusetts which, in 1876, was the first American court to indicate that a charitable institution is not responsible for its torts. (*McDonald v. Massachusetts General Hospital,* 120 Mass. 432). Justice PAXSON apparently did not know, when he lauded the English rule, that England had abandoned it, and apparently was unaware that the Massachusetts court built its decision on a foundation which did not exist.

In 1885, Maryland, in *Perry v. House of Refuge,* 63 Md. 20, added to the superstructure of the foundationless structure begun by Massachusetts. Then, three years later, Pennsylvania brought its blocks of stone with mortar in the *Boyd* case for still another higher addition to this pile which now was starting skyward. So sure was Justice PAXSON of the solidity of the foundation in the *Boyd* case that he spoke sardonically of a decision of the Supreme Court of Rhode Island, a state, which, with a wisdom and courage in inverse proportion to its geographical size, declared that a maltreated hospital patient was entitled to recover for damage done him. Justice PAXSON derided the Rhode Island case: "I will not consume time by discussing the case of Glavin v. Rhode Island Hospital, 12 R.I. 411, which, to some extent, sustains the opposite view of this question. There, a hospital patient paying eight dollars per week for his board and medical attendance, was allowed to recover a verdict against the hospital for unskillful treatment, and it was held that the general trust funds of a charitable corporation are liable to satisfy a judgment in tort recovered against it for the negligence of its officers or agents. It is at least doubtful, whether under its facts the case applies, and if it does, we would not be disposed to follow it in the face of the overwhelming weight of authority the other way, and of the sound reasoning by which it is supported."

Justice PAXSON could be convinced of the "sound reasoning" of his position, but there was as little evidence in 1888 that the charity immunity doctrine commanded "overwhelming authority" as that the doctrine was one of "hoary antiquity."

Nevertheless, the immunity rule began to grow in the United States. Other states followed Massachusetts, Maryland and Pennsylvania, each one speaking of the antiquity of the rule and assuming, as the tower of authority rose, that the doctrine it proclaimed was sunk in the solid rock of historical fact, ballasted with granitic reason and buttressed with ever-accumulating precedent. No one can tell how many persons were injured and even allowed to die in hospitals through the neglect of attendants (with no recourse against the hospital) as this structure of assumed purity pushed toward the clouds.

In the early part of the twentieth century, however, some cracks began to show in the sky-climbing edifice, and then, in 1942, Judge RUTLEDGE (later Justice of the Supreme Court of the United States) of the United States Court of Appeals for the District of Columbia revealed, in perhaps the most searching, analytical, and penetrating opinion on the subject up to that time, that the charity immunity doctrine was built on a foundation of sand.[11] As one reads and reflects on that opinion (*Georgetown College v. Hughes*, 130 F. 2d 810), he is forced to the irresistible conclusion that the immunity doctrine began in error, lifted its head in fallacy, and climbed to its shaky heights only be-

---

[11] In his monumental work on Torts, Prosser says of Judge RUTLEDGE's opinion that it "reviewed all of the arguments in favor of the immunity, and demolished them so completely as to change the whole course of the law. It has been followed by a deluge of decisions holding that there is no immunity at all, and that a charity is liable for its torts to the same extent as any other defendant." Prosser on Torts, 3d Ed., 1964, p. 1023.

cause few dared to question whether charity was really charity.

Judge RUTLEDGE ended his brilliant dissertation on the immunity doctrine with the incontrovertible proposition that: "The incorporated charity should respond as do private individuals, business corporations and others, when it does good in the wrong way."

In 1957 the New York Court of Appeals brought the cloud-capped pyramid of immunity crashing to the ground in the Empire State in the case of *Bing v. Thunig*, 2 N.Y. 2d 656, where the scholarly Judge FULD said: "The doctrine of respondeat superior is grounded on firm principles of law and justice. Liability is the rule, immunity the exception. It is not too much to expect that those who serve and minister to members of the public should do so, as do all others, subject to that principle and within the obligation not to injure through carelessness. It is not alone good morals but sound law that individuals and organizations should be just before they are generous, and there is no reason why that should not apply to charitable hospitals. 'Charity suffereth long and is kind, but in the common law it cannot be careless. When it is, it ceases to be kindness and becomes actionable wrongdoing' . . . Insistence upon respondeat superior and damages for negligent injury serves a two-fold purpose, for it both assures payment of an obligation to the person injured and gives warning that justice and the law demand the exercise of care."

In arguing for retention of the immunity doctrine, its adherents never inquire whether the doctrine is grounded in "good morals and sound law," as did the District of Columbia and New York courts in the decisions just discussed. They are content to refer to previous decisions of this court, and of other courts, as if yesteryear could do no wrong and as if the hand of the past must forever clutch the helm of the present.

No attempt is ever made by the advocates of the immunity doctrine to justify in moral law and fair dealing a doctrine which deprives an injured person of a forum guaranteed to all others.

England, which is supposed to have launched the doctrine, abandoned it, as we have seen, before it ever really set out on an authoritative voyage, and does not accept it today. Nor do Australia, Canada and New Zealand. In the United States, at least twenty-four States have wholly discarded the rule and fourteen other States have modified its application. While Pennsylvania needs no mentor and is capable of judging for itself its own course in jurisprudence, it cannot close its eyes to what is happening in the rest of the legal world, nor can it fail to perceive that tortious immunity will soon take its place in the museum of class distinctions, to eliminate which a free and independent America was founded. As long ago as 1942, legal scholarship was in "general agreement . . . in support of liability and against immunity."[12] Non-liability is an anachronism in the law of today. It is a plodding ox on a highway built for high speed vehicles. It is "out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing. It should be discarded."[13]

Nor is to be feared that with the imposition of liability for torts, accidents in the hospitals will disproportionately increase. It would be a voodoo prediction that with the lifting of the immunity doctrine, hospital patients would leap out of beds to break legs, scar themselves with X-ray machines, rip off bandages, smash plaster of Paris casts, and ingest wrong medicines, in order to further disable themselves and thus collect money damages. No sane person would prefer

[12] *Georgetown College v. Hughes*, supra, p. 810.
[13] *Bing v. Thunig*, supra, p. 667.

money to a sane and healthy body, free of pain, agony and torment.

If havoc and financial chaos were inevitably to follow the abrogation of the immunity doctrine, as the advocates for its retention insist, this would certainly have become apparent in the states where that doctrine is no longer a defense. But neither the defendant hospital nor the Hospital Association of Pennsylvania has submitted any evidence of catastrophe in the States where charitable hospitals are tortiously liable. Moreover, in a country based on the principle of equal justice for all, how can Pennsylvania deny to hospital patients the universally recognized right of compensation for injuries illegally inflicted? Are the inhabitants of hospitals different from other citizens? Are they to be singularized as pariahs or outcasts? When a person removes his street clothes and dons a hospital robe, he does not thereby discard his constitutional prerogatives of compensation for property taken from him. Monetary damages awarded a person in a lawsuit constitute property.

The appellee and the amicus curiae insist that if the charity immunity doctrine is to undergo mutation, the only surgeon capable of performing the operation is the Legislature. We have seen, however, that the controverted rule is not the creation of the Legislature. This Court fashioned it, and, what it put together, it can dismantle. When the Supreme Court of Washington was considering this very question, it said, in the case of *Pierce v. Yakima Valley Memorial Hospital Ass'n,* 260 P. 2d 765: "We closed our courtroom doors without legislative help and we can likewise open them."

The voluminous arguments advanced by the defendant hospital and the amicus curiae, on the subject of the financial problems of hospitals today, are, while interesting and enlightening, wholly irrelevant to the

issue before us. We have a duty to perform and that is to see that justice, within the framework of law, is done. Our function is to decide cases as they come before us on the pertinent facts and law. What could happen in the event the plaintiff obtains a verdict is not an issue here. The pleadings in this litigation require that we decide whether the defendant hospital should answer the charges brought against it by the plaintiff.

In refusing to answer, the defendant asks that we immunize it from a liability which attaches to every other person or establishment in the Commonwealth. We have no jurisdiction to grant such an extraordinary prerogative. This Court has no authority to place anyone beyond the pale of the law applicable to everybody else. The blanket immunization sought by the defendant runs counter to our whole system of democratic society because it sanctions special privilege which cannot be supported legally, philosophically, ethically or morally.

A hospital is dedicated to the repair of the human body. In performing this estimable service it employs devices and medicines which are almost magical in their remedial potentialities, but which, at the same time, can be devastatingly ruinous if not applied with care. A hospital stocks in its therapeutic armory razor-edge bladed instruments, macerating saws, paralyzing drugs, shock contrivances, scalding applications. Is it not bizarre to contemplate that in an orderly society responsible to law, there should be nothing in the law to compel a hospital, under penalty of financial responsibility for negligence, to exercise due care in the use of such dangerous instrumentalities?

And then, aside from the reasons which disclose the legal untenability of a doctrine which excepts a hospital from the exercise of due care in treating its patients, an awareness of human practicalities demon-

strates further how this doctrine cannot be supported sociologically. Human nature being what it is, administrators of a hospital, cognizant that the hospital is insulated from tort liability, may be less likely to exercise maximum scrutiny in selecting personnel than if the hospital were held monetarily liable for slipshod, indifferent, and neglectful conduct of employees. As Judge RUTLEDGE said in the *Georgetown* case, supra, "immunity tends to foster neglect while liability tends to induce care and caution."

Hospitals are showing an appreciation of this trenchant language by Judge RUTLEDGE. The American Hospital Association's Hospital Safety Manual states: "Hospitals are more and more becoming liable to the same kind of legal action as are hotels, theaters and other places of congregation. A hospital's best defense against such action is preventive—it should look for and remove acts or conditions which might be interpreted as contributory negligence should they result in Injury." Hospital Safety Manual 83 (Amer. Hosp. Ass'n & Natl. Safety Council 1956).

Harper and James, in their book The Law of Torts, make the observation: "In some lines of insurance, the amount of money spent on accident prevention exceeds the amount paid for losses." 2 Harper and James, The Law of Torts 773-4 (1956).

It is argued that a charitable hospital is committed to ministering to the halt, the lame and the blind, and, therefore, should not be subjected to lawsuits which might impede it in providing for those entrusted to its care. But is a patient who is injured by the negligence of the hospital not also one of the halt, the lame, and the blind? Why should he be excluded from the solicitude of the hospital because he is more halt, more lame, and more blind than he was when he entered the hospital, due to the hospital's fault? Is this charity? Is it charity to a patient who has entered a hospital for

the removal of gall stones, but, through the hospital's negligence, finds himself with a broken leg which might cripple him for life, not only to deny him compensation for this disablement inflicted upon him, but to compel him, in addition, to pay for the medical treatment required to restore him to a reasonable approximation of what he was before he entered the hospital, even with his gallstones?

Such a crippling, with the crushing burden of the additional medical expenses, could be the means of reducing the patient to poverty, thus placing another person with a dependent family on the lists of public assistance, while the tortfeasor, with all its assets, remains untouched by the tragedy of which it is the author. Can such a spectacle be contemplated with tranquillity in a society built on the proposition that there is no wrong without a remedy?

The Hospital Association of Pennsylvania states its position quite starkly when it says that the problem here is "one of the rights of the public at large to the best possible hospital care at the lowest cost vs. the right of the individual to indemnification."

But what are the rights of the public but the collective rights of the individuals? Government of the people would mean very little if it excluded part of the people. Justice would lose much of its sanctified essence if it applied to all except those who entered charitable hospitals. It is not just, fair or logical, to equate the rights of the hospitals with the rights of the public at large. The public at large does not operate hospitals, but the public at large sustains them and no one of that public at large should be discriminated against when he enters a hospital.

The immunity doctrine offends against fundamental justice and elementary logic in many ways. Thus, while it closes the doors of the courts to a person whose body has been injured, it opens them wide where in-

animate property has been damaged through the hospital's maintenance of a nuisance. "It is paradoxical, to say the least, that in weighing the property interests of a charity against the interest of a victim of its tortious acts, some courts value the property interests of the victim more highly than his interest in life and limb, and hence allow him to recover for damage caused to his property by the charity's maintaining a nuisance, but refuse such recovery where personal injury or death results from the charity's tortious acts." (25 A.L.R. 2d §3, page 40.)

The immunity doctrine assaults equality before the law in another phase of consideration. In *McConnell v. Williams,* 361 Pa. 355, this Court ruled that a senior staff surgeon of a charitable hospital, who delivered a child of his private patient in the hospital, could be held personally liable in damages for an injury done the child by the negligence of an intern on the hospital staff. If a doctor can be made to respond in damages in a situation of this kind, under the rule of respondeat superior, what kind of rationalization excludes the hospital from liability for the negligence of an intern, who was hired and paid by the hospital?

In *Yorston v. Pennell,* 397 Pa. 28, it was held that the surgeon on a charitable hospital's staff was liable in damages for an injury done to a patient in the hospital as the result of the negligence of an intern and resident surgeon employed by the hospital.

In *Rockwell v. Kaplan,* 404 Pa. 574, this Court, following the same reasoning, declared a surgeon liable for the mistake of another physician under his direction and control when the latter doctor, by a negligent injection, caused the plaintiff to lose his arm. If law is to be respected it must present a face of consistency recognizable by the lay world. If the immunity doctrine were to remain untouched, there could be no harmony between the decisions in the three cases just

cited and the denial of liability for the negligence averred by the plaintiff in this case.

Moreover, where an overall responsibility is involved, it would appear that the hospital, which employs, supervises and pays personnel, would be the more logical entity to respond in damages for the negligence of personnel than the doctor, circumstances, of course, governing each case. Absolving hospital management and placing financial responsibility upon the doctor might well be inconsistent with the principle that "liability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury." *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 11 L. Ed. 2d 732, 740.

As already stated, the function of this Court is to determine whether the plaintiffs in this case are entitled to have their claims adjudicated by a fact-finding tribunal. Our decision cannot be influenced by the ricocheting arguments as to what will happen to the fiscal status of the defendant hospital if it is eventually called upon to pay a resulting verdict. There is scarcely a defendant against whom a money judgment is returned but will be hurt or bruised to some extent through expenditure of money which he would perfer to keep in his pocket. But what follows in the wake of a judgment cannot be determinative of the issue as to whether law and justice dictate *that* judgment.

The defendant makes much of the fact that hospital costs have been soaring in recent years. This is true and, this fact, in itself, demonstrates conclusively that the immunity from payment of verdicts in personal injury cases has not kept those costs down. Thus, it is a non sequitur to insist that by retaining the immunity doctrine, hospitals costs will diminish or necessarily remain at present level. The escalating of hospital costs has been inevitable. The installment of new

equipment, the development of fresh procedures, which require more laboratory experimentation and additional machinery, and the employment of more employees because of wage laws, as well as the general high costs of living, have all served to carry hospital operation costs to an altitudinous height.[14] But it must always be borne in mind that these improved hospital services, the new techniques for combatting disease, and the discovery of extraordinary cures through long expensive studies, have all brought about a healthier human being and have expanded the span of life to a degree which 50 years would have seemed wholly visionary. All this costs money, but it could not be expended in a more sensible cause. If responsibility to tort liability increases hospital expenditures but brings about safer methods in caring for the ill and the maimed, that is all part of the price of progress, and augmented, protection to life, limb and health.

Saying this, it becomes almost a matter of fantasy that a person should enter a hospital to be cured of an ailment and to have a broken body made whole, just as a ship enters dry-dock for repairs, and then emerge, because of the fault of those charged with repairing the ship, in worse shape to sail the sea of life than before. And, in addition, be required to pay for the work of the faulty mechanics. In no other phase of negligence law is there such a paradox, and it should not exist here.

The expressed fear that tort liability will cause philanthropists to cease or diminish their contributions to hospitals seems to be an illusory one. If they have not ceased or decreased their contributions because of

---

[14] An article in the Philadelphia Bulletin by Donald McLean, December 11, 1964, states: "Hospitals and medical costs are rising at such a fantastic rate all over the nation, including the Philadelphia area, that there is some danger that hospitals will eventually 'price themselves out of their market.'"

zooming hospital costs due to the erection of new buildings, increase in personnel, and the purchase of expensive equipment, why should they refuse to contribute because of an expense which is as much a part of American civilization as providing assistance for those struck down by the cruel hand of Abject Poverty?

Judge RUTLEDGE in his opinion in the *Georgetown* case, refuted the theory that the removal of charitable immunity would in any way impede the full flow of the fountain of charity: "No statistical evidence has been presented to show that the mortality or crippling of charities has been greater in states which impose full or partial liability than where complete or substantially full immunity is given. Nor is there evidence that deterrence of donation has been greater in the former. Charities seem to survive and increase in both, with little apparent heed to whether they are liable for torts or difference in survival capacity."

Harper and James state that "There is not the slightest indication that donations are discouraged or charities crippled in states which deny immunity." (Ibid, p. 1670).

Failing to hold back both the overwhelming reasons of rudimentary justice for abolishing the doctrine, and the rising tide of out-of-state repudiation of the doctrine, the defendant hospital and the Hospital Association of Pennsylvania fall back for defense to the bastion of Stare Decisis. It is inevitable and proper that they should do so. Without stare decisis, there would be no stability in our system of jurisprudence.

Stare decisis channels the law. It erects lighthouses and flys the signals of safety. The ships of jurisprudence must follow that well-defined channel which, over the years, has been proved to be secure and trustworthy. But it would not comport with wisdom to insist that, should shoals rise in a heretofore safe course and rocks emerge to encumber the passage, the

ship should nonetheless pursue the original course, merely because it presented no hazard in the past. The principle of stare decisis does not demand that we follow precedents which shipwreck justice.

Stare decisis is not an iron mold into which every utterance by a Court, regardless of circumstances, parties, economic barometer and sociological climate, must be poured, and, where, like wet concrete, it must acquire an unyielding rigidity which nothing later can change.

Chief Justice VON MOSCHZISKER of this Court said: ". . . if, after thorough examination and deep thought a prior judicial decision seems wrong in principle or manifestly out of accord with modern conditions of life, it should not be followed as a controlling precedent." (VON MOSCHZISKER, Stare Decisis in Courts of Last Resort, 37 Harv. L. R. 409, at 414.)

The history of law through the ages records numerous inequities pronounced by courts because the society of the day sanctioned them. Reason revolts, humanity shudders, and justice recoils before much of what was done in the past under the name of law. Yet, we are urged to retain a forbidding incongruity in the law simply because it is old. That kind of reasoning would have retained prosecution for witchcraft, imprisonment for debt and hanging for minor offenses which today are hardly regarded misdemeanors.

There is nothing in the records of the courts, the biographies of great jurists, or the writings of eminent legal authorities which offers the slightest encouragement to the notion that time petrifies into unchanging jurisprudence a palpable fallacy. As years can give no sturdiness to a decayed tree, so the passing decades can add no convincing flavor to the withered apple of sophistry clinging to the limb of demonstrated wrong. There are, of course, principles and precepts sanctified by age, and no one would think of changing

them, but their inviolability derives not from longevity but from their universal appeal to the reason, the conscience and the experience of mankind. No one, for instance, would think of challenging what was written in Magna Carta, the Habeas Corpus Act or the Bill of Rights of the Constitution of the United States. Yet, as awesome and revered as is the United States Constitution, an amendment proposed by Congress and adopted by the States in 1919, was repealed less than 15 years later because it was proved to be a despotic encroachment by government on the freedoms of the peoples.[15]

While age adds venerableness to moral principles and some physical objects it occasionally becomes necessary, and it is not sacrilegious to do so, to scrape away the moss of the years to study closely the thing which is being accepted as authoritative, inviolable, and untouchable. The Supreme Court of Michigan said sagaciously in the case of *Williams v. City of Detroit,* 111 N.W. 2d 1, 26, that: "it is the peculiar genius of the common law that no legal rule is mandated by the doctrine of stare decisis when that rule was conceived in error or when the times or circumstances have so changed as to render it an instrument of injustice."

The charitable immunity rule proves itself an instrument of injustice and nothing presented by the defendant or by amicus curiae shows it to be otherwise. In fact, the longer the argument for its preservation the more convincing is the proof that it long ago outlived its purpose if, indeed, it ever had a purpose consonant with sound law. "Ordinarily, when a court decides to modify or abandon a court-made rule of long standing, it starts out by saying that 'the reason for the rule no longer exists.' In this case, it is correct to say that the 'reason' originally given for the rule of immunity never did exist." (*Pierce v. Yakima Valley Hospital Ass'n,* supra, p. 768.)

---

[15] 18th and 21st Amendments.

A rule that has become insolvent has no place in the active market of current enterprise. When a rule offends against reason, when it is at odds with every precept of natural justice, and when it cannot be defended on its own merits, but has to depend alone on a discredited genealogy, courts not only possess the inherent power to repudiate, but, indeed, it is required, by the very nature of judicial function, to abolish such a rule. This Court, in *Commonwealth v. Redline*, 391 Pa. 486, repudiated a phase of the felony-murder rule theretofore accepted; in *Mack v. Reading*, 377 Pa. 135, it abolished the "accident pure and simple" rule; in *Sinkler v. Kneale*, 401 Pa. 267, it discarded the rule that a child may not sue for damages incurred before birth; in *Bartleson v. Glen Alden Coal Co.*, 361 Pa. 519, it nullified the rule that in attractive nuisance cases there must be the element of allurement; in *Bender v. Welsh*, 344 Pa. 392, it abrogated the common law rule that the owner of a domestic animal was not responsible for its straying on a highway unless he knew it had vicious propensities. In *Campbell v. Fiorot*, 411 Pa. 157, it repudiated the rule that the use of the word "skidding" of itself exonerated a motorist from the charge of negligence. In all these cases, and a score or two more, unnecessary to enumerate, this Court did not jettison the principle of stare decisis. It merely threw overboard useless tonnage which was endangering the ship of justice, and imperilling the lives, liberty and property of passengers aboard that ship. As recently as last year, we decommissioned the miscalled "Fair Trade" law which, instead of being a rescue ship for business, as originally intended, proved itself to be a demoralizing derelict on the ocean of commercial, competitive enterprise: "While it is true that great consideration should always be accorded precedent, especially one of long standing and general acceptance, it doesn't necessarily follow that a rule merely estab-

lished by precedent is infallible. Moreover, the court should not perpetrate error solely for the reason that a previous decision, although erroneous, has been rendered on a given question. This is particularly true where no fixed rights of property are involved or where great injustice or injury will result by following the previous erroneous decision. If it is wrong it should not be continued. Judicial honesty dictates corrective action." (*Olin Mathieson Chemical Corporation v. White Cross Stores, Inc.*, 414 Pa. 95.)

Even more recent is the case of *Griffith v. United Air Lines*, 416 Pa. 1, 23, handed down on October 14, 1964, where this Court, speaking through Justice ROBERTS, said: "But we must not perpetuate an obsolete rule by blind adherence to the principle of stare decisis. Although adherence to that principle is generally a wise course of judicial action, it does not rigidly command that we follow without deviation earlier pronouncements which are unsuited to modern experience and which no longer adequately serve the interests of justice. Surely, the orderly development of the law must be responsive to new conditions and to the persuasion of superior reasoning. '[W]hen a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. . . . There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years.' Cardozo, The Nature of the Judicial Process 150-51 (1921)."

Perhaps the most eloquent, potent and meaningful demonstration in modern times of a Court's power to

saw away from the tree of the law a branch which not only was infirm and tainted, but which could in time contaminate the soil of liberty in which the tree itself grew, was the case of *Brown v. Board of Education,* 347 U.S. 483, which, in 1953, repudiated the "separate but equal doctrine" laid down in *Plessy v. Ferguson,* 163 U.S. 537, and declared that there must be no segregation in the public schools of America on the basis of race. As amazing as it must now sound that the law of a country founded on the proposition that all persons are born equal should have countenanced and enforced segregation, yet such was the law of the land until the historic *Brown* decision of May 17, 1954.

Of course, the precedents here recalled do not justify a light and casual treatment of the doctrine of stare decisis but they proclaim unequivocally that where justice demands, reason dictates, equality enjoins and fair play decrees a change in judge-made law, courts will not lack in determination to establish that change. We, therefore, overrule *Michael v. Hahnemann,* 404 Pa. 424, and all other decisions of identical effect, and hold that the hospital's liability must be governed by the same principles of law as apply to other employers.

The judgments of the Court below are reversed with a procedendo.

————

CONCURRING OPINION BY MR. JUSTICE COHEN:

In *Parker v. Port Huron Hospital,* 361 Mich. 1, 105 N.W. 2d 1 (1960), relying mainly upon the analysis of Judge RUTLEDGE in *President and Directors of Georgetown College v. Hughes,* 130 F. 2d 810 (D.C. 1942), Michigan abandoned the judicial rules which would prohibit the instant suit against defendant hospital. I find it unnecessary to say, cite, or do more than was said, cited, or done in *Parker.* Accordingly, I concur in the result reached by the majority.

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

As one who was not on the Court when a majority last reaffirmed its adherence to the doctrine of charitable immunity, I welcome today's opportunity to express some views on the issue.

I concur in what the Court does today for the fundamental reason that, no matter how viewed, the doctrine of charitable immunity cannot withstand unimpassioned analysis. Briefly put, there is really no supportable rationale upon which this judicially-created exception to the ordinary rules of liability can be predicated. The various theories advanced in favor of the doctrine seem to me, at root, as ethereal as the nonexistent English precedent upon which the doctrine was first founded. It would serve little purpose to parade in this opinion the vast number of cases or authorities or to discuss in any detail the weaknesses of the theories which have sustained the doctrine long beyond its day. The abundance of judicial authority and scholarly writings make that a needless exercise.[1]

Our result is strengthened by two facts. In recent years, where the issue of charitable immunity has come before a court as a matter of first impression, the doctrine has been consistently rejected.[2] Moreover, while the unquestioned trend has been to abandon charitable

---

[1] The outstanding judicial authority is *President & Directors of Georgetown College v. Hughes*, 130 F. 2d 810 (D.C. Cir. 1942). Other writings are practically limitless. See, e.g., Prosser, Torts §127 (3d ed. 1964); 2 Harper & James, Torts 1667 (1956); Appleman, "The Tort Liability of Charitable Institutions," 22 A.B.A.J. 48 (1936); Fisch, "Charitable Liability For Tort," 10 Vill. L. Rev. 71 (1964).

[2] See *Moats v. Sisters of Charity of Providence*, 13 Alaska 546 (1952); *Durney v. St. Francis Hospital*, 46 Del. 350, 83 A. 2d 753 (1951); *Foster v. Roman Catholic Diocese of Vermont*, 116 Vt. 124, 70 A. 2d 230 (1950); *Nicholson v. Good Samaritan Hospital*, 145 Fla. 360, 199 So. 344 (1940). See also *Rickbeil v. Grafton Deaconess Hospital*, 74 N.D. 525, 23 N.W. 2d 247 (1946).

immunity,[3] not a single jurisdiction that recognizes full liability has overruled prior authority and adopted charitable immunity.[4] In other words, judicial opinion has tended to go from immunity to liability, but in no instance has it gone from liability to immunity.

I do not believe that we must in any way "penalize" charities for their mistakes. What I do believe is that, in the proven absence of persuasiveness in any of the arguments advanced for maintaining a rule of law which makes negligent injury suffered at the hands of

---

[3] E.g., *Ray v. Tucson Medical Center*, 72 Ariz. 22, 230 P. 2d 220 (1951); *Malloy v. Fong*, 37 Cal. 2d 356, 232 P. 2d 241 (1951); *Wheat v. Idaho Falls Latter Day Saints Hospital*, 78 Idaho 60, 297 P. 2d 1041 (1956); *Haynes v. Presbyterian Hospital Ass'n*, 241 Iowa 1269, 45 N.W. 2d 151 (1950); *Noel v. Menninger Foundation*, 175 Kan. 751, 267 P. 2d 934 (1954); *Mullikin v. Jewish Hospital Ass'n of Louisville*, 348 S.W. 2d 930 (Ky. Ct. App. 1961); *Parker v. Port Huron Hospital*, 361 Mich. 1, 105 N.W. 2d 1 (1960); *Collopy v. Newark Eye & Ear Infirmary*, 27 N.J. 29, 141 A. 2d 276 (1958); *Bing v. Thunig*, 2 N.Y. 2d 656, 143 N.E. 2d 3, 163 N.Y.S. 2d 3 (1957); *Avellone v. St. John's Hospital*, 165 Ohio St. 467, 135 N.E. 410 (1956); *Hungerford v. Portland Sanitarium & Benevolent Ass'n*, 235 Ore. 412, 384 P. 2d 1009 (1963); *Kojis v. Doctors Hospital*, 12 Wis. 2d 367, 107 N.W. 2d 131 (1961); *Pierce v. Yakima Valley Memorial Hosp. Ass'n*, 43 Wash. 2d 162, 260 P. 2d 765 (1953).

[4] The following judicial decisions refused to recognize immunity in the first instance: *Moats v. Sisters of Charity of Providence*, 13 Alaska 546 (1952); *Durney v. St. Francis Hospital*, 45 Del. 350, 83 A. 2d 753 (1951); *President & Directors of Georgetown College v. Hughes*, 130 F. 2d 810 (D.C. Cir. 1942); *Nicholson v. Good Samaritan Hospital*, 145 Fla. 360, 199 So. 344 (1940); *Mulliner v. Evangelischer Diakoniessenverein*, 144 Minn. 392, 175 N.W. 699 (1920); *Mississippi Baptist Hospital v. Holmes*, 214 Miss. 906, 55 So. 2d 142 (1951); *Howard v. Sisters of Charity of Leavenworth*, 193 F. Supp. 191 (D. Mont. 1961); *Welch v. Frisbie Memorial Hospital*, 90 N.H. 337, 9 A. 2d 761 (1939); *Sisters of Sorrowful Mother v. Zeidler*, 183 Okla. 454, 82 P. 2d 996 (1938); *Sessions v. Thomas D. Dee Memorial Hospital Ass'n*, 94 Utah 460, 78 P. 2d 645 (1938); *Foster v. Roman Catholic Diocese of Vermont*, 116 Vt. 124, 70 A. 2d 230 (1950).

charitable institutions noncompensable, such institutions should be held to the same responsibility as any other entity. Charities are, of course, to be encouraged, not penalized. But that is not to say that they should be relieved of the responsibility of compensating those injured through the charities' fault. Under the immunity doctrine, in the rush to somehow "safeguard" charitable assets, the injured individual and his loss seem to have been regrettably forgotten. Personal injury is no less painful, disabling, costly or damage-producing simply because negligent harm is inflicted in or by a charitable institution rather than a non-charitable one. It should be no more protected by law.

One of the most vigorously advanced arguments for adhering to charitable immunity is predicated on stare decisis. But "judicial consistency loses its virtue when it is degraded by the vice of injustice."[5] The principle of stare decisis is more a stabilizing anchor than a permanent deadweight. Unwise rules need not be perpetuated forever. Mr. Justice BRANDEIS was fond of saying that no case was ever settled until it was settled correctly. There is no more arrogance involved in rectifying a mistake than in making it in the original instance. I cannot believe that the common law tradition, which has served us so well because of its illuminating ability to adapt and re-examine itself, demands a policy of unyielding adherence to a thoroughly discredited principle.[6]

---

[5] *Hargrove v. Town of Cocoa Beach*, 96 So. 2d 130, 133 (Fla. 1957).

[6] Recently, in *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A. 2d 796 (1964), this Court had occasion to discuss the applicability of the principle of stare decisis. The pertinent observation is cited in the majority opinion.

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I dissent—I very strongly dissent for each and all of the following reasons:

(1) Hospitals and public charities are, next to the Church, the greatest benefactors known to mankind. They are in reality a Trust for Humanity. The majority Opinion would bring so much harm to nonprofit hospitals and so greatly increase hospital expenses, and likewise the already colossal cost to patients, as to (a) harm all patients for the benefit of an injured few, and (b) jeopardize the existence of a number of hospitals, or (c) require them to reduce or greatly curtail or eliminate a number of their essential services and their functions, facilities, research and other activities and benevolences. Most hospitals in metropolitan areas operate in the red* when their costs and expenses include depreciation, amortization and interest. For the benefit of a few really injured and many imaginatively-injured people and their avaricious lawyers, the lame, the halt and the blind, the poor, the sick, the ill, the needy, and the general public will be deprived of the best services which a hospital can and should provide. Moreover, new buildings, modern equipment, more and better qualified personnel and increased wages will become more and more difficult if not impossible for most charities.

(2) By eliminating charitable immunity for non-profit, charitable hospitals, the majority Opinion likewise abolishes it for Churches, schools and universities, homes for the blind, homes for the aged, homes for crippled or retarded or homeless children, Catholic

---

* In 1964, 61 hospitals in Metropolitan Philadelphia had an *operating loss* (not including depreciation, amortization and interest charges) of $26,801,260. Report of Delaware Valley Hospital Council. Nine of these were Catholic hospitals, one of which operated slightly in the black and the others had total operating losses exceeding $1,100,000.

Home Shelter and five other Catholic child-care institutions in Philadelphia, convents, religious organizations of many denominations, the Salvation Army, the Y.M.C.A., and in short for every other charity—small as well as large—and will undoubtedly jeopardize, especially in small communities, the very existence of many of them which today, in spite of State and City aid and large charitable gifts, are barely able to make both ends meet.

(3) The majority Opinion places the interests of a few individuals above the vital interests of the needy and ill public.

(4) The majority Opinion changes, without any legal or even social justification and with tremendous resulting harm to the public, the public policy of this Commonwealth which has existed for three-quarters of a century and which has been repeatedly and recently reiterated by our Courts: *Fire Insurance Patrol v. Boyd*, 120 Pa. 624, 15 Atl. 553 (1888) ; *Gable v. Sisters of St. Francis*, 227 Pa. 254, 75 Atl. 1087; *Siidekum v. Animal Rescue League of Pittsburgh*, 353 Pa. 408, 45 A. 2d 59 ; *Bond v. Pittsburgh*, 368 Pa. 404, 84 A. 2d 328; *Knecht v. St. Mary's Hospital*, 392 Pa. 75, 140 A. 2d 30; *Michael v. Hahnemann Medical College*, 404 Pa. 424, 172 A. 2d 769 (June 27, 1961) ; *Betts v. Young Men's Christian Association of Erie*, 83 Pa. Superior Ct. 545; *Paterlini v. Memorial Hospital Ass'n*, 247 Fed. 639 (3d Cir. 1918).

Moreover, for approximately 70 years in nearly every Session of the Legislature, attempts have been made to abolish charitable immunity but the Legislature has always refused to make any change or modification in this wise and long established socially benevolent public policy.

(5) The majority Opinion usurps the province of the Legislature which, because of its large numbers from all counties in the Commonwealth, its broad in-

vestigatory powers and ample means, is far better qualified than are four Judges of this Court to determine the wisdom of the existence or modification or abolition of this vitally important public policy. *Mamlin v. Genoe,* 340 Pa. 320, 325, 17 A. 2d 407. The majority Opinion substitutes its idea of wise public policy for the legislatively approved judicial policy in this broad public charitable field in which the Legislature is so much better qualified.

(6) Charities are and always have been favorites of the law in Pennsylvania, for the obvious reason that they render invaluable public service: *Girard College Trusteeship,* 391 Pa. 434, 448, 138 A. 2d 844; *Michael v. Hahnemann Medical College,* 404 Pa., supra; *Little Estate,* 403 Pa. 247, 254, 168 A. 2d 738; *Voegtly Estate,* 396 Pa. 90, 92, 151 A. 2d 593; *Jordan's Estate,* 329 Pa. 427, 429, 197 Atl. 150; *Daly's Estate,* 208 Pa. 58, 66, 57 Atl. 180. Moreover, where private interests and public interests conflict and no Constitutional problem is involved, the public interest should and, whenever reasonably possible, must prevail. Cf. *Miller v. Beaver Falls,* 368 Pa. 189, 192, 82 A. 2d 34.

(7) Two principal reasons, both erroneous, are given to support the majority Opinion. The majority first assert that in good morals, in law and impliedly under the Constitution, there is and must be a remedy for *every* wrong. *This is both factually and legally incorrect.* For example, an injured person has no remedy and no recovery for damages is permitted when the injury resulted from the negligence of an agent or servant of a municipality while engaged in the performance of a governmental function. Moreover, a person injured by false and defamatory statements is not entitled to any recovery or any remedy if such statements were made or published by a high public official if such official was acting in the course of his official duties and within the scope of his authority or within

his jurisdiction even if the statements were made with actual malice and for an improper motive and without reasonable or probable cause. *Montgomery v. Philadelphia*, 392 Pa. 178, 140 A. 2d 100; *Matson v. Margiotti*, 371 Pa. 188, 88 A. 2d 892. Furthermore, it is well established that where a trial Judge in a criminal case makes a clearly erroneous, outrageous and unconstitutional ruling or decision against the Commonwealth— in such a case if the defendant is acquitted, the Commonwealth has no right of appeal and no remedy.

Moreover, the majority distort their contention that "for every wrong or injury there must be a remedy," into meaning that there must be a remedy against those who are insured or in any event against an employer who is best able to pay. In order to support their theory, they rely upon and invoke the doctrine of respondeat superior, which is neither ordained nor even mentioned in the Constitution.

The next reason given by the majority is that most hospitals have insurance and therefore can afford to adequately pay, where the actual wrongdoer cannot. Even if this were a fact, which it is not, there is no legal reason or justification for differentiation in legal liability between persons or charities which have insurance and those which have none. Moreover, what will happen to churches and to very small hospitals and small benevolent charitable homes, institutions and agencies, and to every little charity when they become liable for trespass injuries with their accompanying colossal verdicts? All of these eke out a bare existence while rendering many worthwhile and wonderful services to the public. Doesn't their protection and preservation *pro bono publico* require a continuation of charitable immunity?

(8) The majority Opinion, subjecting all churches, charities and charitable organizations (small as well as large) to trespass claims, will greatly decrease—as soon

as the colossal verdicts become known—charitable contributions which are the life blood of most hospitals, churches, and charities, and thereby jeopardize their very existence.

(9) If charitable immunity is abolished, it will aid the very few at the expense of the very many. Trespass litigation is already clogging and swamping our Courts (especially in large cities) and this Court load will undoubtedly be tremendously increased by suits against hospitals not only for real injuries but also for imaginary ailments, and for ailments and illnesses which were not cured by hospital care, and will be thought and alleged by the patient to be caused by negligence in the care or cure. Such suits will be limited only by the imagination of the discharged patients and the ingenuity of astute lawyers specializing in the field of Tort, with the added result that Justice for thousands of injured persons who need speedier relief in their negligence suits, will be further unfairly postponed and jeopardized.

(10) If charitable immunity is to be abolished it should be abolished prospectively instead of retroactively. Retroactive application will raise difficult Constitutional questions and questions of statutory limitation, and will likely subject all charities to suits for injuries and real or imaginary ailments which allegedly occurred in the last two or more years and for which the charities are not and could not be prepared.

(11) The majority Opinion deals another mortal blow to the principle of Stare Decisis and the certainty and stability which is so absolutely necessary for the protection and preservation of the property and the rights of every individual, every hospital, and every other charity in Pennsylvania.

In *Bond v. Pittsburgh*, 368 Pa., supra, Mr. Chief Justice HORACE STERN, speaking for the Court, said

524

(pages 407-408): "Notwithstanding the violent criticisms that have been directed by academic legal writers against the doctrine of the immunity of charitable organizations from tort liability, and notwithstanding also the fact that there is considerable conflict in the judicial decisions on the subject among the several States, our own Commonwealth has, from the earliest times, stood firm in its adherence to the principle of immunity. For confirmation of that assertion it is only necessary to refer to such cases as Fire Insurance Patrol v. Boyd, 120 Pa. 624, 15 A. 553; Gable v. Sisters of St. Francis, 227 Pa. 254, 75 A. 1087; Siidekum, Administrator, v. Animal Rescue League of Pittsburgh, 353 Pa. 408, 45 A. 2d 59; Betts v. Young Men's Christian Association of Erie, 83 Pa. Superior Ct. 545; Paterlini v. Memorial Hospital Ass'n of Monongahela City, 247 Fed. 639 (3 C.C.). In the Gable case, supra, it was said (p. 258, A. p. 1088), 'It is a doctrine too well established to be shaken, and as unequivocally declared in our own state as in any other, that a public charity cannot be made liable for the tort of its servants.' Surely a doctrine so deeply embedded in the structure of our common law should not lightly be overturned in violation of the rule of stare decisis. Principles of the common law are not established or developed arbitrarily; they congeal during the course of the years from the fluidity of recurrent judicial decisions which presumably reflect the sentiments and social values of the community. Measured by that standard there is no class of institutions more favored and encouraged by our people as a whole than those devoted to religious or charitable causes. Public-minded benefactors are not likely to have their generous impulses encouraged if advised that some janitor, watchman or other employe of a charitable organization who carelessly fails to note the displacement of a brick or stone

in a pavement* may thereby bring about the loss of all the property and funds which the donors had sought to devote to the common good. If and when there is to be any change in the doctrine of the immunity of charitable institutions from tort liability, it ought to be effected, not by the courts, but by the legislature, which is, of course, the ultimate tribunal to determine public policy. Incidentally, it will be remembered that this is not the only class of cases in which the victim of an accident may not recover damages from other than the individual who actually committed the tort; for instance, no such recovery is permitted where the accident results from the negligence of the agent or servant of a municipality while engaged in the performance of a governmental function."

In *Knecht v. St. Mary's Hospital*, 392 Pa. 75, 140 A. 2d 30, Mr. Chief Justice JONES, speaking for the Court, quoted with approval and at great length from *Bond v. Pittsburgh*, supra, and said (pages 76, 77-78) : "The immunity of an eleemosynary institution from tort liability has long been the established rule in Pennsylvania: Bond v. Pittsburgh, 368 Pa. 404, 84 A. 2d 328; Siidekum, Admr. v. Animal Rescue League of Pittsburgh, 353 Pa. 408, 45 A. 2d 59; Gable v. Sisters of St. Francis, 227 Pa. 254, 75 A. 1087; Fire Insurance Patrol v. Boyd, 120 Pa. 624, 15 A. 553; Betts v. Young Men's Christian Association of Erie, 83 Pa. Superior Ct. 545.

". . . the law on this subject in Pennsylvania is clear. Charitable institutions are not subject to liability for tort. It is that rule which the appellant would have us now abandon by court decision.

---

* or if they learn that a hospital, which is the frequent object of their generosity, has just been compelled to pay a colossal verdict because, allegedly, some orderly, janitor, nurse, student or volunteer brought germs into a hospital, or left a patient in a drafty corridor or failed skillfully to perform either a menial or an important service.

"The rule was most recently reviewed in the case of Bond v. Pittsburgh, supra, in which the opinions for both the majority and the minority were agreed that the rule should remain as heretofore short of legislative change. Mr. Chief Justice STERN, speaking for the majority, said that '. . . our own Commonwealth has, from the earliest times, stood firm in its adherence to the principle of immunity.' The majority opinion further pertinently stated that 'If and when there is to be any change in the doctrine of the immunity of charitable institutions from tort liability, it ought to be effected, not by the courts, but by the legislature, which is, of course, the ultimate tribunal to determine public policy.' The dissenter in the Bond case likewise recognized that 'The doctrine of immunity of charities has in recent years been recurrently criticized as outmoded, unrealistic, illogical, inconsistent and not in public interest, but nevertheless . . . agree[d] with the majority that the principle is now too firmly imbedded in our law to be removed except by legislation. . . .'

"A rule of non-liability, even though judge-made, that has become as firmly fixed in the law of this State as has the charitable immunity from tort liability, should not be abrogated otherwise than by a statute made to operate prospectively. If the rule were to be abandoned by court decision, it would lay open to liability all charities for their torts of the past that were not barred by the statute of limitations at the time of the rendition of the rescinding decision. The injustice of such an imposition of liability upon charities that theretofore had a right to rely on the rule of immunity is readily apparent. . . ."

I am very greatly disturbed by the virtual extirpation of the principle of stare decisis, on which the House of Law was built. In the last six years the Supreme Court of Pennsylvania has overruled cases

in over 40 different areas of the law which had been, prior thereto, firmly established. Today no one knows from week to week, or Court session to Court session, whenever the Supreme Court of the United States or the Supreme Court of Pennsylvania meets, what the law will be tomorrow, or what are one's rights, privileges, responsibilities and duties.

In a Constitutional republican form of Government such as ours, which is based upon law and order, *Certainty and Stability are essential.* Unless the Courts establish and maintain certainty and stability in the law, businessmen cannot safely and wisely make contracts with their employees or with each other; the meaning of wills, bonds, contracts, deeds and leases will fluctuate and change with each change in the personnel of a Court; property interests will be jeopardized and frequently lost or changed; Government cannot adequately protect law-abiding persons or communities against criminals; private citizens will not know their rights and obligations; and public officials will not know from week to week or month to month the powers and limitations of Government. This has been recognized for centuries by English-speaking peoples. Lord COKE, Chief Justice of England, thus wisely expressed (circa 1600) these truths: "The knowne certaintie of the law is the safetie of all." This has been a beacon light for Anglo-American Courts, for text authorities, and for law-abiding Americans ever since the foundation of our Country. In the realm of the law it is usually expressed in the principle known as Stare Decisis. Stare Decisis is one of the bed-rocks upon which the House of Law has been erected and maintained.

In *Brown v. Allen,* 344 U.S. 443 (1953), Mr. Justice JACKSON (in a concurring opinion on the abuse of the writ of habeas corpus) aptly and pertinently said (page 535) : "Rightly or wrongly, the belief is widely

held by the practicing profession that this Court no longer respects impersonal rules of law but is guided in these matters by personal impressions which from time to time may be shared by a majority of Justices. Whatever has been intended, this Court also has generated an impression in much of the judiciary that *regard for precedents and authorities is obsolete,* that *words no longer mean what they have always meant to, the profession,* that *the law knows no fixed principles.*"*

Mr. Justice FRANKFURTER, in his concurring opinion in *Green v. United States,* 356 U.S. 165, 192 (1958) said: "To be sure, it is never too late for this Court to correct *a misconception in an occasional decision, even on a rare occasion* to change a rule of law that may have long persisted but also have long been questioned and *only fluctuatingly applied.* To say that everybody on the Court has been wrong for 150 years [75 years] and that that which has been deemed part of the bone and sinew of the law should now be extirpated is quite another thing. . . . *The admonition of Mr. Justice* BRANDEIS *that we are not a third branch of the Legislature should never be disregarded.*"

Mr. Justice DOUGLAS, who is generally regarded as the leading opponent of Stare Decisis, in an article written for the Columbia Law Review of June 1949, Vol. 49, p. 735, said: "Uniformity and continuity in law are necessary to many activities. If they are not present, the integrity of contracts, wills, conveyances and securities is impaired. *And there will be no equal justice under law if a negligence rule is applied in the morning but not in the afternoon.* Stare decisis provides some moorings so that men may trade and arrange their affairs with confidence. Stare decisis serves to take the capricious elements out of law and

---

* Italics throughout, ours.

to give stability to a society. It is a strong tie which the future has to the past."

It is obvious, if we are to progress, that there always will be exceptions to every general rule or principle, and that neither the law nor the principle of stare decisis can or should be as immutable as the laws of the Medes and the Persians. Nevertheless, it is obvious, at least to me, that the principle of stare decisis should not be ignored or extirpated, actually or effectually, because of changes in the personnel of a Court. Mr. Justice FRANKFURTER has stated the two exceptions which to him seem justifiable. I agree with him, and while I would express the same thoughts a little differently, I would go further. I would hold that the principle of Stare Decisis should always be applied, *irrespective of the changing personnel of this (or any Supreme) Court,* except in the two situations set forth by Justice FRANKFURTER and in the following situations: (1) Where the Supreme Court of Pennsylvania is convinced that prior decisions of the Court are irreconcilable, or (2) the application of a rule or principle has *undoubtedly* created great confusion; or (3) in those rare cases where the Supreme Court is· *convinced* that the reason for the law *undoubtedly* no longer exists, and modern circumstances and Justice combine to require or justify a change, and no one's present personal rights or vested property interests will be injured by the change. Change of circumstances or modern circumstances does not mean, nor has it ever heretofore been considered as the equivalent of "change of personnel in the Court," or the substitution of the social or political philosophy of a Judge for the language of the Constitution or of a written instrument, or for well settled principles of law.

Mr. Justice OWEN J. ROBERTS, Pennsylvania's most illustrious member of the Supreme Court of the United States, in a dissenting Opinion in *Smith v. Allwright,*

321 U.S. 649, 669, thus aptly and strikingly expressed his views concerning the erosion or abolition of the principle of stare decisis: "The reason for my concern is that the instant decision, overruling that announced about nine years ago, tends to bring adjudications of this tribunal into the same class as a *restricted railroad ticket, good for this day and train only*. I have no assurance, in view of current decisions, that the opinion announced today may not shortly be repudiated and overruled by justices who deem they have new light on the subject."

Mr. Justice EAGEN well expressed the same concern for Stare Decisis in the recent case of *Commonwealth v. Woodhouse*, 401 Pa. 242, 253, 164 A. 2d 98 (1960) : ". . . Unquestionably, in a republican form of government as we are privileged to enjoy, order, certainty and stability in the law are essential for the safety and protection of all. Stare Decisis should not be trifled with. *If the law knows no fixed principles, chaos and confusion will certainly follow . . .* If it is clear that the reason for a law no longer exists and modern circumstances and justice require a change, and no vested rights will be violated, a change should be made."

Chief Justice BLACK and Chief Justice JONES so aptly expressed the principles which should govern the Courts of Pennsylvania, irrespective of the social or political philosophy of the constantly changing members of the Court, that at the risk of piling Ossa upon Pelion we shall quote what they so wisely said.

In *Michael v. Hahnemann Medical College and Hospital of Philadelphia*, 404 Pa. 424, Chief Justice JONES, speaking for the Court as recently as June 27, 1961, said (pages 426-427 and 427-428) : "The rule of charitable immunity has long since been in force in Pennsylvania, see Fire Insurance Patrol v. Boyd, 120 Pa. 624, 15 Atl. 553 (1888). If the doctrine of charitable

immunity is, as the appellants contend, no longer suited to the times and should be dispensed with, the proper way to accomplish that end is prospectively by legislation and not retroactively by judicial ukase. Under our democratic form of government, it is the legislature that can competently declare and promulgate public policy and not the courts. It is to be hoped, therefore, that, with this current decision, the appellants' contention will assume a state of quiescence so far as further insistent court action is concerned. Perhaps that is too much to hope for. It is just three years since the identical contention was urged upon us and rejected in Knecht v. St. Mary's Hospital, 392 Pa. 75, 140 A. 2d 30. . . .

"What Chief Justice BLACK said for this court in McDowell v. Oyer, 21 Pa. 417, 423 (1853), concerning stare decisis, is presently most apposite, viz., 'It is sometimes said that this adherence to precedent is slavish; that it fetters the mind of the judge, and compels him to decide without reference to principle. But let it be remembered that *stare decisis* is itself a principle of great magnitude and importance. *It is absolutely necessary to the formation and permanence of any system of jurisprudence.* Without it we may fairly be said to have no law; for law is a fixed and *established rule,* not depending in the slightest degree on the caprice of those who may happen to administer it. . .'."

We once again repeat the words of Mr. Justice JACKSON: *"this Court has generated an impression* in much of the judiciary [and of the Bar] *that regard for precedents and authorities is obsolete,* that words no longer mean what they have always meant to the profession, that *the law knows no fixed principles."*

For years I have fought vigorously but vainly for the protection and preservation of Stare Decisis. After 40 or more major operations, it would appear that

the principle is not dying, but dead. So I conclude by saying: Stare Decisis—don't rest in a hospital, just rest in peace.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

For over three-quarters of a century this Court has constantly adhered to the doctrine which rendered charitable institutions immune from tort liability. Today, by divided vote, this Court abolishes this doctrine.

It may well be that the time has come to reevaluate and reexamine the reasons which motivated the creation of this doctrine and to determine, under present day conditions, the justification, if any, for the continuance of the doctrine. However, although fully cognizant that this doctrine is "judge made" law created by judicial, not legislative, fiat, in my opinion, this doctrine has become part of the public policy of this Commonwealth, a public policy which, if it is to be changed, should be effected by legislative action. The abolition of the "charitable immunity" doctrine will affect adversely and seriously all[1] charitable institutions throughout the Commonwealth and the impact of such extinction is a matter of grave public concern. Under such circumstances, I believe that the legislature and not this Court should act in this area.

---

[1] It is a matter of concern that from the majority opinion an implication arises that the doctrine is abolished only as to hospitals when sued by patients who paid for the hospital services. If the doctrine is to be abolished, reason and common sense dictate that the doctrine should be abolished as to all charitable institutions regardless of whether the service rendered by such institutions was paid for or not.